No. 23-3065

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

**CHARLES MATTHEW ERHART**,

*Plaintiff-Appellee,*

v.

**BofI FEDERAL BANK**

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of California
No. 15-cv-02287-BAS-NLS
Hon. Cynthia Bashant

_____

**APPELLEE'S ANSWERING BRIEF**

_____

**THE GILLAM LAW FIRM**
*A Professional Law Corporation*
Carol L. Gillam (SBN 102354)
Sara Heum (SBN 288136)
10880 Wilshire Boulevard, Suite 1101
Los Angeles, CA 90024
Telephone: (310) 203-9977
Fax: (310) 203-9922

*Attorneys for Appellee*
CHARLES MATTHEW ERHART

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ....................................................... iii

I.  INTRODUCTION .................................................................1

II.  JURISDICTIONAL STATEMENT ....................................2

III.  ISSUES PRESENTED .......................................................3

IV.  STATEMENT OF THE CASE .........................................4

    A.  Factual Background............................................................4

        1.  Mr. Erhart's employment with BofI ............................4

        2.  Mr. Erhart's whistleblowing and termination............................6

        3.  March 6, 2015, termination........................................8

        4.  June 9, 2015, termination.........................................10

        5.  BofI's CEO defames Mr. Erhart ..............................11

        6.  Mr. Erhart's emotional distress and reputational harm ...........11

    B.  Procedural History..............................................................13

V.  SUMMARY OF THE ARGUMENT .................................15

VI.  STANDARD OF REVIEW................................................21

VII.  ARGUMENT....................................................................23

    A.  BofI failed to establish a "same-action" defense. ...............23

    B.  The district court did not abuse its discretion in admitting evidence   of BofI's lawsuits against Mr. Erhart's mother and girlfriend. ..............................................................29

1.      BofI did not make this argument in its JMOL and New Trial Motion and therefore waived it. ........................................29

2.      The district court's allowing in evidence of BofI's lawsuits against Mr. Erhart's mother and girlfriend was not an abuse of discretion and did not cause a miscarriage of justice. ..........30

C.    There was sufficient evidence of emotional distress and reputational harm resulting from BofI's unlawful retaliation against Mr. Erhart. ................................................................35

1.      BofI waived the argument that Mr. Erhart did not suffer reputational harm. ......................................................35

2.      There was sufficient evidence of Mr. Erhart's emotional distress due to BofI's retaliation. ..............................................36

3.      There was sufficient evidence of Mr. Erhart's reputational harm due to BofI's retaliation. ..................................................41

D.    The district court did not abuse its discretion in denying BofI's motion for a new trial on the grounds that the jury's award was grossly excessive. ..................................................................42

E.    Sufficient evidence supports the jury's award for defamation. ..........47

1.      BofI waived this argument for its Rule 50(b) motion..............47

2.      The jury's award is amply supported by the evidence. ............49

VIII.  CONCLUSION.............................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agarwal v. Johnson*,
   25 Cal. 3d 932 (1979) .........................................................................43

*Alozie v. Arizona Board of Regents*,
   562 F. Supp. 3d 203 (D. Ariz. 2021) .............................................45, 48

*Austin v. Univ. of Oregon*,
   925 F.3d 1133 (9th Cir. 2019) ..............................................30, 35, 46

*Bahra v. Cnty. of San Bernardino*,
   2022 WL 6653533 (C.D. Cal. Sept. 7, 2022) .............................41, 43

*In re Bard IVC Filters Prod. Liab. Litig.*,
   969 F.3d 1067 (9th Cir. 2020) ...........................................................21

*Barranco v. 3D Sys. Corp.*,
   952 F.3d 1122 (9th Cir. 2020) .....................................................22, 33

*Carey v. Piphus*,
   435 U.S. 247 (1978).............................................................................37

*Chalmers v. City of Los Angeles*,
   762 F.2d 753 (9th Cir.1985) ...............................................................51

*City Solutions, Inc. v. Clear Channel Communications, Inc.*,
   365 F.3d 835 (9th Cir. 2004) .............................................................22

*Coszalter v. City of Salem*,
   320 F.3d 968 (9th Cir. 2003) .............................................27, 28, 31

*CSX Transp., Inc. v. Hensley*,
   556 U.S. 838 (2009) (per curiam).................................................34, 39

*D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*,
   692 F.2d 1245 (9th Cir. 1982) ......................................................44, 45

*Dees v. Cty. of San Diego*,
   960 F.3d 1145 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1501 (2021) .........*passim*

iii

*Doherty v. State Farm Gen. Ins. Co.*,
  2022 WL 2230123 (C.D. Cal. Jan. 11, 2022) ....................................................44

*E.E.O.C. v. Go Daddy Software, Inc.*
  581 F.3d 951 (9th Cir. 2009) ...............................................................................47

*Fenner v. Dependable Trucking Co.*,
  716 F.2d 598 (9th Cir. 1983) ...............................................................................43

*Flores v. City of Westminster*,
  873 F.3d 739 (9th Cir. 2017) ...............................................................................28

*Glenn-Davis v. City of Oakland*,
  No. C 02-02257SI, 2007 WL 687486 (N.D. Cal. Mar. 5, 2007).......................44

*Greisen v. Hanken*,
  925 F.3d 1097 (9th Cir. 2019) ......................................................................30, 35

*Harvey v. Home Depot, Inc.*,
  Case No. 2004-SOX-36, 2004 ..............................................................................37

*Indep. Towers of Washington v. Washington*,
  350 F.3d 925 (9th Cir. 2003) ...............................................................................35

*ING Glob. v. United Parcel Serv. Oasis Supply Corp.*,
  757 F.3d 92 (2d Cir. 2014) ..............................................................................21, 27

*Janes v. Wal–Mart Stores, Inc.*,
  279 F.3d 883 (9th Cir. 2002) ...............................................................................47

*Johnson v. Albertsons LLC*,
  No. 2:18-01678-RAJ, 2020 WL 3604107 (W.D. Wash. July 2,
  2020) ......................................................................................................................45

*Johnson v. Hale*,
  13 F.3d 1351 (9th Cir. 1994) ........................................................37, 40, 41, 51

*Jordan v. Clark*,
  847 F.2d 1368 (9th Cir. 1988) ...............................................................................28

*Jordan v. Sprint Nextel Corp.*,
  3 F. Supp. 3d 917 (D. Kan. 2014).........................................................................37

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) .................................................................22

*Kode v. Carlson*,
    596 F.3d 608 (9th Cir. 2010) .................................................................22

*Krechman v. County of Riverside*,
    723 F.3d 1104 (9th Cir. 2013) ...............................................................21

*Landes Const. Co., Inc. v. Royal Bank of Canada*,
    833 F.2d 1365 (9th Cir. 1987) ...............................................................43

*Lawson v. PPG Architectural Finishes, Inc.*
    (2022) 12 Cal. 5th 703 ..........................................................................26

*Musin v. Honeywell International, Inc.*
    (D. Nev., Dec. 11, 2020, No. 219CV02058JADNJK) 2020 WL
    7321064...................................................................................................37

*Newton v. Equilon Enters., LLC*,
    411 F. Supp. 3d 856 (N.D. Cal. 2019)...................................................28

*Paul v. Asbury Auto. Grp., LLC*,
    No. CIV.06-1603-KI, 2009 WL 188592 (D. Or. Jan. 23, 2009) .......44

*Plotnik v. Meihaus*,
    208 Cal. App. 4th 1590 (2012) .............................................................43

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000).......................................................38, 45, 49, 50

*Tan Lam v. City of Los Banos*,
    976 F.3d 986 (9th Cir. 2020) .................................................................34

*United States v. CB & I Constructors, Inc.*,
    685 F.3d 827 (9th Cir. 2012) ...........................................................37, 42

*United States v. Lloyd*,
    807 F.3d 1128 (9th Cir. 2015) ...............................................................33

*Van Asdale v. International Game Technology*,
    577 F.3d 989 (9th Cir. 2009) .................................................................26

v

*Wagner v. Cty. of Maricopa*,
   747 F.3d 1048 (9th Cir. 2013) ...........................................................22

*Wallace v. City of San Diego*,
   479 F.3d 616 (9th Cir. 2007) .............................................................47

*Winarto v. Toshiba Am. Elecs. Components, Inc.*,
   274 F.3d 1276 (9th Cir. 2001) ...........................................................28

*Wooten v. BNSF Ry. Co.*,
   387 F. Supp. 3d 1078 (D. Mont. 2019), aff'd, 819 F. App'x 483
   (9th Cir. 2020)..........................................................................41, 43

*Yanowitz v. L'Oreal USA, Inc.*,
   36 Cal. 4th 1028 (2005) ...................................................................27

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) ......................................................47, 48

*Zhang v. Am. Gem Seafoods, Inc.*,
   339 F.3d 1020 (9th Cir. 2003) .............................................36, 37, 40, 51

**Statutes**

California Labor Code § 1102.5 ...............................................*passim*

California Penal Code § 632 ................................................................9, 25

Computer Fraud and Abuse Act ............................................................33

Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, *et seq.*.......................1, 13, 23, 26

**Other Authorities**

Fed. R. Civ. Proc. 50 ..........................................................*passim*

Fed. R. Civ. Proc. 59 ...........................................................................22, 44

Fed. R. Evid. 401(a)–(b) ......................................................................31

Fed. R. Evid. 403 ..................................................................................33, 34

## I.  INTRODUCTION

In October 2015, Charles Matthew Erhart ("Mr. Erhart") sued BofI Federal Bank ("the Bank," "BofI" or "Appellant") for whistleblower retaliation under the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A, *et seq.*, and California Labor Code § 1102.5, as well as for defamation and wrongful termination in violation of public policy. Mr. Erhart was terminated soon after engaging in the protected activities of complaining to the Bank's management and to the Office of the Comptroller of the Currency ("OCC"). He complained about a host of issues he believed were violations of the law. The Bank countersued him on a variety of theories.

At trial, the jury found in Mr. Erhart's favor on each cause of action, rejected all of the Bank's counterclaims, and awarded damages for emotional distress and reputational harm of $1 million for Mr. Erhart's SOX, Labor Code § 1102.5, and wrongful termination in violation of public policy claims (the "retaliation claims"), and $500,000 for defamation. *See* 15-ER 2969-2975. The jury heard evidence supporting each claim and each damage award, including the substantial emotional distress and reputational harm which Mr. Erhart suffered as a result of BofI's retaliation and defamation.

The jury also heard about how the Bank sued Mr. Erhart's mother and girlfriend. The district court determined such evidence was relevant to several

claims at trial. First, the lawsuits were relevant for demonstrating the Bank's retaliatory intent for Mr. Erhart's retaliation claims. Second, the Bank had countersued Mr. Erhart for allegedly breaching a confidentiality agreement by taking documents from the Bank to support his whistleblowing. The jury needed the full story of what happened with the documents in order to determine damages. *See* 1-ER-25-26. The trial court properly gave limiting instructions about that evidence, including *explicitly* instructing that Mr. Erhart could not recover any damages as a result of those lawsuits. 15-ER-2859-2859.

The trial court spent months deciding the Bank's motion for judgment as a matter of law or alternatively, for new trial ("JMOL and New Trial Motion"). This resulted in a very carefully thought-out, well crafted, 27-page opinion addressing each of the arguments raised by the Appellant (other than those it waived). The last brief by Appellant was filed December 22, 2022. 3-ER-408. The order denying the motion was filed September 28, 2023, more than nine months later. 1-ER-31. The district court did not err or abuse its discretion in denying BofI's motion, and that order should be affirmed.

## II. JURISDICTIONAL STATEMENT

The Appellee agrees with Appellant's jurisdictional statement.

## III.   ISSUES PRESENTED

1. Did the district court err in denying BofI judgment as a matter of law, or abuse its discretion in denying a new trial, on grounds that BofI established its same-conduct affirmative defense to Mr. Erhart's employee retaliation claims by clear and convincing evidence?

2. Did the district court abuse its discretion in overruling BofI's objections to evidence showing BofI sued Mr. Erhart's mother and former girlfriend in 2016, and did this prejudice BofI?

3. Did the district court err in denying BofI judgment as a matter of law, or abuse its discretion in denying a new trial, on grounds that insufficient evidence tied Mr. Erhart's emotional distress or reputational injury to actionable retaliatory conduct?

4. On Mr. Erhart's retaliation claims, did the district court abuse its discretion in denying a new trial or a remittitur of the jury's award for emotional distress and reputational harm, on grounds it was grossly excessive?

5. Did the district court err in denying BofI judgment as a matter of law, or abuse its discretion in denying a new trial, on grounds that insufficient evidence tied Mr. Erhart's emotional distress or reputational injury to actionable defamatory statements?

3

## IV.   STATEMENT OF THE CASE

### A. Factual Background

#### 1.  Mr. Erhart's employment with BofI

Mr. Erhart (called "Matt" by many), joined the Bank as an internal auditor in September 2013 at age 27. 5-ER-900. Prior to BofI, he had taken his university finance degree and 4.0 GPA, and gone to work as an examiner for FINRA (Financial Industry Regulatory Authority) for three and a half years. 5-ER-891-897. His FINRA experience was useful for his new role, but he readily admitted there was still "a huge learning curve." 5-ER-897.

Mr. Erhart's direct supervisor at BofI was Jonathan Ball. Mr. Ball had been the head of internal audit at another bank before joining BofI in the same role. He shared his experiences with Mr. Erhart of working at a bank that had failed. 8-ER-1581-1582. Mr. Ball's decades of experience in managing internal audit departments at banks meant he was a great resource for Mr. Erhart when he had concerns. Mr. Erhart repeatedly uncovered issues while doing his audit work. Again and again, he went to Mr. Ball for guidance. 5-ER-903, 913, 928, 940, 947, 961, 975; 4-ER-1060, 1102, 1105, 1112, 1184.

Critically important to the case was the early experience Mr. Erhart had when the Bank's general counsel actually directed him to remove a negative finding from an audit report about a perceived violation of California law. Why?

4

"Because it could be discoverable in a class-action lawsuit" against the Bank." 5-ER-948.

As Mr. Erhart documented his disturbing findings and increasing concerns in writing to management (not only to his supervisor Mr. Ball), several things happened in short order. The head of the Governance, Risk, and Compliance Group, John Tolla, changed Mr. Erhart's performance evaluation to rate Mr. Erhart less favorably than his manager Mr. Ball had originally rated him. 4-ER-652-653, 665-667. Mr. Erhart was told to rely less on sharing his concerns in emails and instead to use a "more proactive approach" of "getting out and meeting with data owners and business unit managers." 4-ER-666. And ominously, to Mr. Erhart, the Senior Vice President of Audit and Compliance made a statement in Mr. Erhart's presence: "In passing, he said out loud, if Matt continues to turn over rocks, he is going to find a snake and get bit." 6-ER-1098; SER-10, SER-39. Mr. Erhart reported this to his direct supervisor. SER-39.

Other concerns which Mr. Erhart raised with Mr. Ball included those related to deposit concentration risk (5-ER-975-976; 6-ER-1100-1101; 5-ER-962; SER-25), improper diligence on loans to criminals and politically exposed persons (6-ER-1054; 5-ER-998-999); and numerous other issues (*see* 15-ER-2971).

Mr. Ball assured Mr. Erhart that the issues he had raised were not going to be buried, and that he, Ball, "was going to go to the [Bank's] Audit Committee

with [them]". 7-ER-1395. One finding disturbed Mr. Erhart greatly: it appeared that the Bank's CEO was depositing third-party checks into his personal account at the Bank without approval. 6-ER-1102. When Mr. Erhart raised this with Mr. Ball, the latter responded, "He's doing that again?" and "I thought the Audit Committee told him to knock that off." 6-ER-1102; 9-ER-1671-1672. Over and over, Mr. Ball validated the seriousness of Mr. Erhart's concerns.

Mr. Erhart had never been put on a performance improvement plan (and there was no reason to according to Ball), nor had he been written up for anything. 4-ER-804-806; 8-ER-1583. Ball testified that the written quality of Mr. Erhart's audits was good. 8-ER-1582.

## 2. Mr. Erhart's whistleblowing and termination

In the same time period as concerns mounted for Mr. Erhart, the Bank's principal regulator – the Office of the Comptroller of the Currency ("OCC") – was conducting a "full-scope examination" of the Bank. Its examiners were onsite at the Bank. 4-ER-718-719.

Mr. Erhart grew concerned that the Bank was withholding information from the OCC. 5-ER-939-940, 979, 982. His supervisor, Mr. Ball, was the point person with the OCC for audit functions at the Bank. 4-ER-718. Yet in an astonishing act for a longtime executive, Mr. Ball "walked out" from his job, during work hours,

in the middle of the OCC's onsite examination, with no notice to Mr. Erhart or to his other direct reports. 5-ER-992-993.

The following day, Friday, March 6, 2015, Mr. Erhart called off from work. He contacted the OCC that morning to report his concerns. 5-ER-1019. He contacted an OCC lawyer in Denver to receive assurance that he would be protected as a whistleblower. 8-ER-1552-1553; 6-ER-1088-1090; SER-63-64. The OCC set a meeting with Mr. Erhart for the following Monday, March 9, 2015. To prepare for the meeting, Mr. Erhart "spent a big portion of [his] weekend combining all the issues, most of –a lot of them which were initially intended for the Audit Committee, into a document and provided a written document that was 10 to 15 pages, approximately, in length to the OCC via email…." 5-ER-1019-1020. Erhart used his girlfriend's laptop to compile his fifteen-page "Notes for Whistleblower Discussion." 7-ER-1260-1261.

After a telephonic meeting with the OCC, he followed up, at the OCC's direction, with an in-person meeting at their office in Carlsbad, California. 6-ER-1080-1082. He brought his Bank-issued laptop computer to the meeting. The OCC, together with Mr. Erhart, tried without success to download the supporting documentation for his concerns from the laptop. 5-ER-990-991; 6-ER-1200-1201. When that failed, the OCC asked him to send the documents to them when he got

home. 5-ER-990-991. Also around this time, Erhart emailed his mother documents related to his allegations of wrongdoing for safekeeping. 6-ER-1090-1092.

### 3. March 6, 2015, termination

During his case, Mr. Erhart presented several adverse witnesses from the Bank to discuss what they were doing during this critical time period. As it turns out, John Tolla, the SVP for Audit and Compliance, had decided to terminate Mr. Erhart shortly after he called off that Friday morning – as in, mere hours later. The reasons, he testified, were that Mr. Erhart "was being dishonest" and not at work "for a critical meeting." 4-ER-754. Further, he testified that "if he, you know, is sitting at home playing video games, that I felt like he should be terminated on the spot." *Id*. The human resources head whom Mr. Tolla claimed to have told could not recall any "mention that Mr. Erhart had done anything dishonest." 4-ER-805.

Such an on-the-spot termination was contrary to the Bank's attendance policy, which was to terminate an employee if they were out for three days without explanation (no call, no show). 5-ER-852-854.

Moreover, Mr. Tolla did more than get angry about Mr. Erhart's absence. He directed staff to open the locked cabinets at Mr. Erhart's workstation. In them, he found a memorandum documenting the concerns about wrongdoing by the CEO that Mr. Erhart had discussed with Mr. Ball. 4-ER-675-678; 6-ER-1096.

8

A termination letter was prepared immediately, to be hand delivered to Mr. Erhart forthwith, along with retrieving the Bank's laptop. 4-ER-755; SER-54. By the time Mr. Tolla made the termination decision, he had found the memorandum on the CEO and was aware of Mr. Erhart's having identified a bevy of other issues at the Bank, including putting a major finding in the Lottery Audit that the Bank had violated California Penal Code § 632, and raising concerns that the Bank had failed to properly respond to an SEC subpoena. 4-ER-790; 12-ER-2326-2328. By the week of March 9, 2015, the Bank knew that Mr. Erhart had been communicating with the OCC; they also knew the subject matter of those communications. 4-ER-688, 689.

Even the CEO became involved in efforts to recover the laptop from Mr. Erhart, a highly unusual action. 4-ER-810-813. Equally unusual was giving a directive to the head of information technology "to go out to collect company property" from an employee (to say nothing of hand delivering a termination letter). 4-ER-809; *see also* 4-ER-755.

The IT head was unsuccessful in reaching Mr. Erhart in person. 4-ER-808. During that same critical time period, a key OCC employee warned Mr. Erhart that the Bank was threatening to send the police after him. 6-ER-1124, 1156-1157. Mr. Erhart was aware that the Bank was attempting to deliver a termination letter. 5-ER-905-906; 6-ER-1124, 1156-1157; SER-7-8.

Before he could receive the March 6 termination letter, Mr. Erhart contacted his doctor and applied for medical leave. 4-ER-759-761, 765. The Bank processed his request for medical leave but still insisted that Mr. Erhart return any "BofI laptop….as soon as possible." 5-ER-845-846. This was unusual. The head of human resources, the Bank's Chief Performance Officer, admitted that up until that time she had never retrieved a laptop from an employee who was out on medical leave. 5-ER-846; 4-ER-798-799, 813. Mr. Erhart complied and returned the laptop promptly. 5-ER-846; 6-ER-1078.

By mid-April, Mr. Erhart had submitted a formal whistleblower complaint to OSHA, and BofI was aware of this. 4-ER-797; 6-ER-1135-1136.

### 4. June 9, 2015, termination

The Bank told Mr. Erhart that his medical leave began March 6, 2015 (the same date as the undelivered termination letter). 5-ER-846-848; 3-ER-328-332. The Bank failed again to follow its own policies. Usually, the leave coordinator at the Bank would reach out to an employee to coordinate a return-to-work date. 4-ER-803. That did not happen. Nor did the Bank warn Mr. Erhart that his leave was about to expire, or that it had expired. 5-ER-851. Instead, the Bank sent Mr. Erhart a termination letter on June 9, 2015, claiming he had failed to report to work for more than three consecutive days (the same policy the Bank had failed to follow on March 6, 2015). 5-ER-852-853; 3-ER-335-336.

10

## 5. **BofI's CEO defames Mr. Erhart**

On October 14, 2015, the day after Mr. Erhart filed his lawsuit against BofI, the Bank's CEO Gregory Garrabrants spoke about the lawsuit on a transcribed public investor call. 2-ER-283-292; see 6-ER-1152. Garrabrants called Mr. Erhart "an inexperienced, underperforming, junior audit team member." 2-ER-282. He said Mr. Erhart "did not understand the Bank's management reporting systems" and was a "poor performer." 2-ER-283. Mr. Garrabrants further stated that Mr. Erhart's emails "were often incoherent and they did not elicit responses because of their incoherence." 2-ER-284. Garrabrants said "[Mr. Erhart] was doing a lot of things that he clearly was not competent to do . . . why was he so incompetent at what he was doing?" 2-ER-288. He told callers that Mr. Erhart displayed a "shockingly a low level of performance." *Id*. He said Mr. Erhart "was doing a lot of things that he was so unqualified to do." 2-ER-290. He claimed that Mr. Erhart's emails displayed "a lack of basic understanding of the things that you're looking at." 2-ER-291. Further, he asserted that Mr. Erhart "was routinely misunderstanding basic things." 2-ER-292.

## 6. **Mr. Erhart's emotional distress and reputational harm**

Mr. Erhart testified that, following his termination, he suffered from physical symptoms, including times where it was "hard … to breathe, sleepless nights … episodes where I became so sick to my stomach that I threw up. Just constant…

11

anxiety." 6-ER-1149. He talked about the "burden it took on [his] relationship" with his girlfriend and his difficulty finding work. 6-ER-1159.

Mr. Erhart testified that he did not suffer from anxiety before he began working at BofI. 6-ER-1149. Before the March 6, 2015, termination, Mr. Erhart had been threatened for putting things in writing, and he had also been threatened that if he kept turning over rocks, he would find a snake and get bitten. 6-ER-1098; SER-10; SER-39.

Mr. Erhart testified about experiencing stress beginning the morning of March 6, 2015, when BofI first attempted to terminate him. 6-ER-1219-1220. Mr. Erhart was also aware that the Bank was attempting to deliver a termination letter and apparently sending the police after him when he went out on medical leave. Those actions caused him fear. 5-ER-905-906; 6-ER-1124, 1156-1157; SER-7-8.

Mr. Erhart testified that he "suffered from severe anxiety, breathing issues from all the stress, particularly related to the fear of the Bank's retaliation against -- against me and my loved ones." 12-ER-2385. He testified that he feared for his safety during the period after March 6, 2015, particularly given Mr. Tolla's comments that he might get bitten by a snake if he kept turning over rocks, and given that an OCC regulator told him that the Bank was sending the police to his house. 5-ER-1025-1026.

12

Mr. Erhart's mother testified that she observed that her son was "not the same," that he used to be "the glass is half full kind of guy … [h]e just didn't dwell on negative thoughts…very happy-go-lucky…very confident." She testified that now he "doesn't carry the same confidence…[h]e is very timid." She testified further that these differences started when he lost his job at the Bank. 10-ER-2000.

Mr. Erhart testified that he was unable to keep his job at Renovate America (the job he obtained after being fired by the Bank) due to Garrabrants' comments on the October 14, 2015, investor call. 6-ER-1157-1158. Additionally, Mr. Erhart testified that he encountered people who had heard these comments about him 5 to 10 times. 6-ER-1153. Mr. Erhart went on to testify that, since the investor call, he has not had the career he expected, that he has worked hard to get promoted and to obtain new credentials, and that he is lucky to get even part time work through former FINRA colleagues, amounting to 10-15 hours a week. 6-ER-1159-1160.

**B. Procedural History**

In October 2015, Mr. Erhart sued BofI for whistleblower retaliation under Sarbanes Oxley ("SOX") and California Labor Code § 1102.5, as well as for defamation and wrongful termination in violation of public policy. The Bank countersued him on a variety of theories. In fact, the Bank had more counterclaims go to trial against Mr. Erhart than his claims that it defended.

13

At trial, the jury found in Mr. Erhart's favor on each cause of action, rejected all of the Bank's claims, and awarded damages for emotional distress and reputational harm of $1 million for Mr. Erhart's Sarbanes-Oxley, California Labor Code § 1102.5, and wrongful termination in violation of public policy (the "retaliation claims"), and $500,000 for defamation. *See* 15-ER 2969-2975. The jury heard evidence supporting each claim and each damage award, including the substantial emotional distress and reputational harm which Mr. Erhart suffered as a result of BofI's retaliation and defamation.

The jury also heard about how the Bank sued his mother and his girlfriend. The district court determined such evidence was relevant to several claims at trial. First, the lawsuits were relevant for demonstrating the Bank's retaliatory intent in terminating Mr. Erhart. Second, the Bank had countersued Mr. Erhart for allegedly breaching a confidentiality agreement by taking documents from the Bank to support his whistleblowing. The jury needed the full story of what happened to documents in order to determine the Bank's damages. *See* 1-ER-25-26. This included the fact that Erhart had used his girlfriend's laptop to compile his fifteen-page "Notes for Whistleblower Discussion," as well as sending his mother documents for safekeeping as part of his whistleblowing. 6-ER-1090-1092; 7-ER-1260-1261.

14

The trial court properly gave limiting instructions about that evidence, including explicitly instructing that Mr. Erhart could not recover any damages as a result of those lawsuits. 15-ER-2859-2859.

The jury instructions were clear: "An unfavorable personnel action can only be taken while the employee is still employed." 15-ER-2926. The verdict form required that the damages must have resulted from an unfavorable personnel action. 15-ER-2970-2972. Mr. Erhart was likewise clear in arguing that "he is claiming emotional distress and harm, and damage to his reputation as a result of an unfavorable personnel action." 14-ER-2701.

The trial court spent months deciding the Bank's motion for judgment as a matter of law or alternatively, for new trial. This resulted in a very carefully thought-out, well crafted, 27-page opinion addressing each of the arguments raised by the Appellant (other than those it waived). The last brief by Appellant was filed December 22, 2022. 3-ER-408. The order denying the motion was filed September 28, 2023, more than nine months later. 1-ER-31.

## V. SUMMARY OF THE ARGUMENT

**Issue No. 1: BofI failed to establish its same-action affirmative defense by clear and convincing evidence.**

BofI asks this court to adopt its one-sided view of the evidence and thereby ignore powerful testimony impeaching the Bank's claimed reasons for firing Mr.

Erhart. The jury learned that BofI prepared a termination letter for Mr. Erhart on March 6, 2015, immediately after discovering Mr. Erhart's memorandum documenting concerns about wrongdoing by the Bank's CEO. This also followed a prolonged period in which Mr. Erhart had raised numerous other concerns about wrongdoing at the Bank. At one point, the Senior Vice President of Audit and Compliance told Mr. Erhart that "if Matt continues to turn over rocks, eventually he is going find a snake and he's going to get bit."

Additionally, Mr. Erhart's direct supervisor, Jonathan Ball, testified that the written quality of Mr. Erhart's audits was good and BofI had never put Mr. Erhart on a performance improvement plan, nor written him up for anything.

In this context, BofI attempted to deliver to Mr. Erhart the March 6, 2015, termination letter. Mr. Erhart was aware of this. Ultimately, the Bank prepared another termination letter on June 9, 2015. This was after the Bank was acutely aware that Mr. Erhart had been communicating with the OCC and had filed a claim with OSHA. This letter purported that they were terminating Mr. Erhart for failure to return to work following FMLA leave. However, the evidence showed that BofI did not follow its normal policies and practices in terminating Mr. Erhart on these grounds. For example, no one reached out to Mr. Erhart to coordinate a return-to-work date, nor to warn him that his leave was expiring. Instead, it summarily terminated him.

16

Viewing the evidence in the light most favorable to Mr. Erhart, the jury was free to conclude that BofI failed to meet its burden to prove it would have taken the same action by clear and convincing evidence.

**Issue No. 2: Evidence of BofI's lawsuits against Mr. Erhart's mother and girlfriend was relevant, and the district court did not abuse its discretion in admitting it.**

In early 2016, BofI filed lawsuits against Mr. Erhart's mother and girlfriend. This was after it had terminated Mr. Erhart and he had filed the instant lawsuit for whistleblower retaliation and defamation against BofI. The Bank claimed that these lawsuits were filed so that the Bank could recover documents Mr. Erhart had allegedly given them.

These lawsuits were plainly relevant for at least two reasons. First, the lawsuits were relevant to demonstrate the Bank's retaliatory intent in terminating Mr. Erhart, *i.e.* to rebut its claim that Mr. Erhart's termination was a matter of following an ordinary attendance policy. Second, the jury was also considering the Bank's counterclaims against Mr. Erhart. The Bank alleged that Mr. Erhart breached a confidentiality agreement and committed other violations by taking documents from the Bank to support his whistleblowing. The jury needed the full story of what happened to the documents in order to determine the Bank's damages. The district court thus allowed evidence of these lawsuits.

17

However, in doing so, it implemented numerous safeguards. The jury was repeatedly reminded in the jury instructions, in the verdict forms, and in closing argument that Mr. Erhart could only recover for unfavorable personnel actions. The jury was explicitly instructed that Mr. Erhart could not recover for harm stemming from those lawsuits. Accordingly, the district court did not abuse its discretion in admitting this evidence. Nor was BofI prejudiced.

**Issue No. 3: Sufficient evidence supported the jury's finding that Mr. Erhart suffered emotional distress and reputational harm resulting from BofI's retaliation against Mr. Erhart.**

Mr. Erhart testified to physical symptoms of anxiety, including sleeplessness, nausea, and breathing issues. He testified that these symptoms, which persisted for years, had not occurred prior to working at BofI. His mother testified to changes in his personality. This evidence was tethered to BofI's efforts to terminate him, including specific testimony regarding the fear he experienced when BofI attempted to physically deliver a termination letter and to send the police after him in March 2015. Moreover, the jury was permitted to make reasonable inferences in attributing some of the emotional distress to BofI's unfavorable personnel actions.

In attempting to avoid this conclusion, BofI adopts a one-sided view of the evidence, ignoring the powerful testimony describing Mr. Erhart's emotional harm

18

and damage to his reputation. BofI further fails to view the evidence in the light most favorable to Mr. Erhart and make reasonable inferences in his favor, as the law requires.

Regarding BofI's challenge of reputational damages, BofI waived its argument because it did not adequately raise it in the district court. Nevertheless, Mr. Erhart also testified to lasting reputational harm which significantly hampered his career. Again, the jury was permitted to make reasonable inferences in attributing some reputational harm to BofI's terminating Mr. Erhart. Accordingly, viewing the evidence in light most favorable to Mr. Erhart, sufficient evidence supported the damages awarded here.

**Issue No. 4: The damages awarded were not grossly excessive.**

As described in Issue No. 3, above, Mr. Erhart suffered significant emotional distress and reputational harm as a result of BofI's unlawful conduct. Ninth Circuit law does not require objective evidence. Nor does it permit a jury's award to be set aside simply because it does not correspond to any particular calculation presented to the jury. Rather, the calculation of damages is left to the discretion of the jury, who are in the best position to assess the degree of harm suffered. BofI does not offer any proposition for what the "right amount" of damages should have been. Nor does it cite any evidence whatsoever suggesting that the jury award was driven

by passion or prejudice. Accordingly, the district court did not abuse its discretion in denying a new trial or remittitur on grounds of grossly excessive damages.

**Issue No. 5: Sufficient evidence supported the jury's finding that Mr. Erhart suffered emotional distress and reputational harm resulting from BofI's defamation of Mr. Erhart.**

In October 2015, BofI CEO Gregory Garrabrants spoke on a publicly transcribed investor call, and made numerous defamatory comments about Mr. Erhart that he was incompetent at his job. This was after Mr. Erhart had been terminated by the Bank and a day after Mr. Erhart filed the instant whistleblower lawsuit.

As described in Issue No. 3, above, Mr. Erhart suffered significant emotional distress and reputational harm as a result of BofI's unlawful conduct. Of course, the jury was permitted to infer that at least some of the harm described was attributable to Garrabrants' defamatory comments. In addition, Mr. Erhart testified to emotional distress and reputational harm that was directly tethered to defamation. He testified that he was unable to keep his job at Renovate America after his superiors heard Mr. Garrabrants' comments. Mr. Erhart testified that he encountered people who had heard these comments about him on five to ten occasions. He testified to emotional distress directly stemming from the comments,

including being worried about how Mr. Garrabrants' statements would be interpreted by others and the impact on his reputation.

Again, BofI impermissibly ignores large swaths of this testimony, selecting only pieces of it to paint the facts in a more favorable light to itself. Moreover, BofI waived this argument because it failed to raise it pre-verdict in a Federal Rules of Civil Procedure 50(a) motion. Accordingly, the damages award for defamation must stand.

## VI. STANDARD OF REVIEW

A denial of a renewed motion for a judgment as a matter of law pursuant to Fed. R. Civ. Proc. 50(b) is reviewed de novo. *See In re Bard IVC Filters Prod. Liab. Litig.*, 969 F.3d 1067, 1077 (9th Cir. 2020). In reviewing a judgment as a matter of law, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *See Dees v. Cty. of San Diego,* 960 F.3d 1145, 1151 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1501 (2021). In deciding the motion, the court may not make credibility determinations or weigh the evidence. *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013). The court may not substitute its view of the evidence for that of the jury. *Id.* The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

21

A district court's denial of a new trial pursuant to Fed. R. Civ. Proc. 59 is reviewed for abuse of discretion. The district court "enjoys considerable discretion in granting or denying the motion." *Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003). A district court's denial of a motion for new trial will not be overturned absent a "clear" abuse of discretion. *See Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) ("we have reviewed for a "clear" abuse of discretion, a wording that emphasizes our deference to the jury's findings and our obligation to decide matters of law, not of fact"); *City Solutions, Inc. v. Clear Channel Communications, Inc.*, 365 F.3d 835, 843 (9th Cir. 2004) ("a party who appeals from the denial of a motion for a new trial has a substantial burden to overcome in demonstrating that the trial judge abused his discretion.") (internal citation omitted).

Evidentiary rulings are reviewed for an abuse of discretion. *See Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020); *Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013). To reverse on the basis of an erroneous evidentiary ruling, the court must conclude not only that the district court abused its discretion, but also that the error was prejudicial. *See Barranco*, *supra*, 952 F.3d at 1127; *Wagner*, *supra,* 747 F.3d at 1052.

## VII. ARGUMENT

### A. BofI failed to establish a "same-action" defense.

Appellant challenges the jury's findings of the facts demonstrating retaliation under three causes of action: Sarbanes-Oxley ("SOX"), Cal. Lab. Code § 1102.5, and wrongful termination in violation of public policy. Likewise, it challenges the jury's rejection of its attempt to prove, by clear and convincing evidence, that it would have taken the same action had Mr. Erhart not engaged in protected activity. There was ample evidence of the Bank's knowledge of Mr. Erhart's protected activity before it made the decision to fire him. There was temporal proximity. There was motive. There were serious credibility issues with its witnesses who strained to claim a legitimate reason for the Bank's actions.

As the trial court found in its ruling on the motion appealed here, credibility determinations were put front and center at trial. 1-ER-6; 1-ER-8. Mr. Erhart presented a considerable portion of his case by calling BofI's current or former employees.

As laid out in detail in the Statement of the Case, above, the Bank terminated Mr. Erhart in the midst of Mr. Erhart's serious efforts at internal and external whistleblowing. This was after the Senior Vice President of Audit and Compliance, John Tolla, made a statement in Mr. Erhart's presence: "In passing,

he said out loud, if Matt continues to turn over rocks, he is going to find a snake and get bit." 6-ER-1098; SER-10; SER-39.

Additionally, the head of internal audit and Mr. Erhart's supervisor, Jonathan Ball, testified that the written quality of Mr. Erhart's audits was good. 8-ER-1582. Further, BofI had never put Mr. Erhart on a performance improvement plan, nor written him up for anything. 4-ER-804-806; 8-ER-1583.

On March 5, 2015, Mr. Ball walked out from his job with no warning, in the middle of an OCC full-scope examination. Mr. Erhart called out from work the next day, March 6, 2015. Mr. Tolla directed staff to open the locked cabinets at Mr. Erhart's workstation. In them, he found a memorandum documenting the concerns about wrongdoing by the CEO that Mr. Erhart had discussed with Mr. Ball. 4-ER-675-678. The Bank defied its normal policies and practices in immediately preparing a termination letter even though Mr. Erhart had only been absent for one morning. 5-ER-852-854. Mr. Erhart was aware at this time that the Bank had opened his locked cabinets, was attempting to deliver a termination letter and was sending the police after him. 5-ER-905-906; 6-ER-1096; 6-ER-1124, 1156-1157; SER-7-8.

By the time Mr. Tolla made the termination decision on the morning of March 6, 2015, he had found Mr. Erhart's memorandum on the CEO. He was aware of Mr. Erhart's having identified a bevy of other issues at the Bank,

24

including putting a major finding in the Lottery Audit that the Bank had violated California Penal Code § 632, and raising concerns that the Bank had failed to properly respond to an SEC subpoena. 4-ER-790; 12-ER-2326-2328. By the week of March 9, 2015, the Bank had learned that Mr. Erhart had been communicating with the OCC and also knew the subject matter of the communications. 4-ER-688, 689.

When the Bank delivered its second termination letter on June 9, 2015, it also defied its usual policies. Usually, the leave coordinator at the Bank would reach out to an employee to coordinate a return-to-work date. 4-ER-803. That did not happen. Nor did the Bank warn Mr. Erhart that his leave was about to expire, or that it had expired. 5-ER-851. Instead, the Bank sent Mr. Erhart a termination letter on June 9, 2015, claiming he had failed to report to work for more than three consecutive days. 3-ER-336. This also occurred after the Bank was aware Mr. Erhart had been communicating with the OCC and had filed a complaint with OSHA.4-ER-797; 6-ER-1135-1136.

Against all these facts, the Bank argues that its "same decision" defense should have succeeded, and when the jury rejected it, that the trial court should have overturned the jury's findings. In order to establish this "same-action" affirmative defense, BofI was required to prove "by clear and convincing evidence" that it would have engaged in the same adverse personnel actions "for

legitimate, independent reasons, even if Mr. Erhart had not engaged in the protected activity." 15-ER-2930 (Instruction No. 21); *see Van Asdale v. International Game Technology*, 577 F.3d 989, 996 (9th Cir. 2009) (clear and convincing evidence required for same-action defense under SOX); 18 USC § 1514A(b)(2)(A); *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal. 5th 703, 718 (clear and convincing evidence required for same-action defense under Lab. Code § 1102.5 and Lab. Code, § 1102.6).

BofI argues that it met this considerable burden and that the jury's finding that it did not prove its "same-action" affirmative defense should be disregarded. In so doing, it presents a very one-sided summary of the facts that blatantly flies in the face of the requirement to view the facts in the light most favorable to Mr. Erhart, and to draw all reasonable inferences in his favor. *See Dees, supra,* 960 F.3d at 1151. The Bank conveniently ignores the abundant evidence that it had retaliated against Mr. Erhart, and claimed instead that it merely processed a routine termination in June. The jury was free to reject that contention, and it did so. In fact, the jury not only rejected the Bank's affirmative defenses, but it also rejected all six of the Bank's own claims against Mr. Erhart.

The jury was properly instructed, and it was free to find, that the Bank retaliated against Mr. Erhart in violation of SOX, the California Labor Code and the common law tort of wrongful termination in violation of public policy. While

the Bank strains mightily to argue that the only adverse action was the June 9

termination after Mr. Erhart's medical leave, the jury was free to find otherwise.

"Whether an adverse employment action is intended to be retaliatory is a question

of fact that must be decided in the light of the timing and the surrounding

circumstances." *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003);

*Yanowitz v. L'Oreal USA, Inc.,* 36 Cal. 4th 1028, 1061-62 (2005).

Perhaps the Bank thought the trial court was not paying attention at trial,

because it argued in its JMOL and New Trial Motion that the evidence at trial

proved it was "uncontroverted" that the Bank terminated Mr. Erhart for "job

abandonment." 2-ER-74. It proceeded to argue "there was no evidence" that the

termination "resulted from any reporting of alleged wrongdoing." 1-ER-76. Such

an improper and wholly one-sided framing of the issues caused it to lose credibility

with the trial court, as it should again here.

In contradiction of well-established law, BofI argued that the jury had to

credit its stated reason for firing Mr. Erhart. Not so. The court simply must

disregard all evidence favorable to the moving party that the jury is not required to

believe. *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d

Cir. 2014) (internal citations omitted).

The jury was free to consider all the evidence, make credibility

determinations, assess circumstantial evidence, examine the proximity in time

27

between Mr. Erhart's protected activity and the Bank's retaliatory termination decision, and find that the pattern of conduct the Bank engaged in was consistent with retaliatory intent. *See Coszalter*, *supra,* 320 F.3d at 978; *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988); *see also Flores v. City of Westminster*, 873 F.3d 739, 750 (9th Cir. 2017).

There was ample evidence, as recited above, that led the jury to conclude that Mr. Erhart's termination and other adverse actions were motivated by his protected activity. *See, e.g.*, *Newton v. Equilon Enters., LLC*, 411 F. Supp. 3d 856, 868 (N.D. Cal. 2019) ("However, it is the jury's purview to decide what the evidence means, whether it is credible, and how to weigh it.").

By contrast, Appellant had a heavy lift to somehow prove that "there can be but one reasonable conclusion as to the verdict," namely, that the jury got it completely wrong. *See Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). This it manifestly failed to do. Instead, it once again, unpersuasively, asks a court to disregard the actual evidence at trial and find instead that Appellant's fanciful version of its adverse employment actions that they would have occurred regardless of all Mr. Erhart's protected activity and all of its own retaliatory conduct in response.

Appellant tries to argue that the only relevant evidence was the black-and-white written policies of the Bank, not the evidence that the Bank disregarded its

own policies -- and practices -- when it suited the Bank to do so. The jury was not required to view the June 9, 2015, termination in isolation. It was properly instructed to consider all the facts and circumstances, as well as make its own credibility determinations as to the Bank's employees and as to Mr. Erhart. While the Bank's written policy may have said Mr. Erhart was subject to termination without any warning, its normal practice was otherwise. The jury could view the fact that Mr. Erhart had no documented performance issues and that the Bank was aware of Mr. Erhart's whistleblowing activity by March 6, 2015, and again, June 9, 2015 (including that he had gone to the OCC and OSHA), motivated its decision to terminate his employment.

In sum, this court should affirm the judgment and rule that Appellant failed to carry its significant burden to overturn the jury's verdict.

## B. The district court did not abuse its discretion in admitting evidence of BofI's lawsuits against Mr. Erhart's mother and girlfriend.

### 1. <u>BofI did not make this argument in its JMOL and New Trial Motion and therefore waived it.</u>

BofI's opening brief states that it "appeals the district court's denial of its Renewed Motion for Judgment as a Matter of Law Or In The Alternative, Motion for New Trial." Appellant's Opening Brief ("AOB") at 1. However, the issue of whether the district court abused its discretion by allowing evidence of its lawsuits against Mr. Erhart's mother and girlfriend was not raised as grounds for

29

overturning the verdict in that motion. Rather, BofI only mentioned these lawsuits tangentially in footnotes in alleged support of its argument that insufficient evidence supported Mr. Erhart's emotional distress damages due to retaliation. *See* 2-ER-79-81 (footnotes 8-9). The lack of meaningful briefing in the lower court on this issue as grounds for overturning the verdict should render this argument waived. *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) (holding that a "passing reference" to an issue "[w]ithout meaningful briefing" waives it); *see also Greisen v. Hanken,* 925 F.3d 1097, 1115 n.6 (9th Cir. 2019) (holding that issue "briefly alluded" to in Rule 50(b) motion was not "raised sufficiently for the trial court to rule on it" and "the issue was waived for this reason.").

### 2. <u>The district court's allowing in evidence of BofI's lawsuits against Mr. Erhart's mother and girlfriend was not an abuse of discretion and did not cause a miscarriage of justice</u>.

The jury made a determination that the Bank retaliated against Mr. Erhart and caused him to suffer significant emotional distress as a result of its retaliation. The court did not abuse its discretion in allowing in evidence of the Bank's post-termination conduct, including its bringing lawsuits against his mother and then-girlfriend. This evidence was relevant to show that the Bank's actions in terminating Mr. Erhart were retaliatory. It was also relevant for Mr. Erhart's defense of the Bank's counterclaims against him for what he did with its

information. Nor was this decision prejudicial to the Bank because the court explicitly instructed the jury on what was and was not compensable conduct for Mr. Erhart's claims.

First, evidence of the Bank's conduct in suing Mr. Erhart's mother and then-girlfriend was relevant to showing the Bank had retaliatory intent when it terminated Mr. Erhart. Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. Fed. R. Evid. 401(a)–(b). Furthermore, whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *Coszalter v. City of Salem* 320 F.3d 968, 978 (9th Cir. 2003).

Here, as the lower court determined, the lawsuits *were* relevant. 1-ER-29-30. The lawsuits against Mr. Erhart's mother and girlfriend were not brought in a silo because Mr. Erhart just decided to "give" confidential information to his mother and girlfriend. *See* AOB at 24. Instead, they were brought after Mr. Erhart had made whistleblower disclosures to the OCC, retained an attorney, filed a claim with OSHA, and brought his own whistleblower retaliation lawsuit against the Bank. 4-ER-797; 6-ER-1135-1136; 5-ER-1026; 1-ER 9; 5-ER-1019-1020. As the lower court succinctly summarized the events in its Order denying the JMOL and New Trial Motion:

31

> Before meeting with the OCC, Erhart used his girlfriend's laptop to compile his fifteen-page "Notes for Whistleblower Discussion." (Trial Tr. 5-1312:13 to 5 1313:9.) Around the same time, Erhart emailed his mother several documents related to his allegations of wrongdoing for safekeeping. (*Id.* 4-1056:15 to 4 1057:23.) The Bank later sued not only Erhart, but also his girlfriend and mother in separate proceedings to supposedly recover its confidential information. (*Id.* 4 1115:15 to 17; 4-1116:11 to 15.) These additional lawsuits caused Erhart to feel awful and at blame for his mother's and girlfriend's predicaments. (*Id.* 4-1118:3 to 7; *see also id.* 4-1115:15 to 20.)

1-ER-29.

The court permitted testimony about the lawsuits because they were relevant to the "'overall picture'" of the circumstances surrounding Mr. Erhart's termination. 1-ER 29. It allowed the jury to determine whether the course of conduct that began during Mr. Erhart's employment at the Bank and which culminated in his termination was truly that of a Bank just following its written policies or whether it was retaliation.

The jury heard about Mr. Tolla's decision to prepare a termination notice by noon of the day he found Mr. Erhart's audit work (including a memorandum on what he reasonably believed to be wrongdoing by the Bank's CEO) (4-ER-754-755, 805; SER-54); the unusually aggressive efforts the Bank went through to retrieve Mr. Erhart's computer after he called out sick (4-ER-755, 798-799, 809-813; 5-ER-845-846); and the Bank's deviation from its own policies in failing to reach out to Mr. Erhart to see if he was returning to work after his medical leave expired. 4-ER-803; 5-ER-851-853; 3-ER-335-336. In this context, the jury could

consider that the Bank's later suing Mr. Erhart's mother and girlfriend after he retained counsel and brought his whistleblower lawsuit made it more likely true than not that the Bank's stated reasons for Mr. Erhart's termination were mere pretext and that his termination truly was retaliatory.

Additionally, the court did not abuse its discretion in determining the evidence of those suits was relevant to Mr. Erhart's defenses against the Bank's counterclaims. The Bank claimed that Mr. Erhart breached a confidentiality agreement, breached his fiduciary duties, and violated the Computer Fraud and Abuse Act, among other things, because Mr. Erhart emailed his mother Bank confidential information, and because he saved confidential information on his girlfriend's laptop. *See* 15-ER-2939-2950; 6-ER-1090-1091. The court determined that Mr. Erhart should be able to "tell his story of what happened," including using his girlfriend's laptop as part of his whistleblowing, and emailing his mother a document for safekeeping. 7-ER-1442; *see also* 1-ER-29-30; 6-ER-1090-1091.

Second, the court's ruling admitting evidence of the lawsuits was not prejudicial. *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020). A district court's Rule 403 determination is subject to great deference, because " 'the considerations arising under Rule 403 are susceptible only to case-by-case determinations, requiring examination of the surrounding facts, circumstances, and issues.' " *United States v. Lloyd*, 807 F.3d 1128, 1152 (9th Cir. 2015) (internal

33

citations omitted). An error creates a miscarriage of justice if it "seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1006 (9th Cir. 2020) (quoting *C.B. v. City of Sonora*, 769 F.3d 1005, 1019 (9th Cir. 2014) (en banc)).

The court properly found evidence of the lawsuits admissible at trial under Federal Rule of Evidence 403 and that BofI failed to show there was a miscarriage of justice by admitting evidence of the lawsuits. BofI. 1-ER-30; 7-ER-1443. The court addressed the Bank's concerns about the lawsuits by explicitly instructing the jury that they could not award damages for emotional distress suffered as a result of any lawsuits or for emotional distress suffered by Mr. Erhart's mother or girlfriend. 15-ER-2953, 2958-2959. There is no evidence whatsoever that the jury failed to heed those instructions. *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) (per curiam) (holding that the jury is presumed to follow the court's instruction).

In sum, the jury weighed the evidence, made credibility determinations, and determined that the Bank's termination of Mr. Erhart was done for retaliatory reasons. Evidence of non-compensable post-retaliation conduct was relevant to painting the picture and allowing the jury to infer the intent behind the retaliation, as well as allowing Mr. Erhart to tell his story in defending against the Bank's counterclaims for what he did with its information in the course of his

34

whistleblowing. The jury received appropriate instruction on this evidence. There was no abuse of discretion or miscarriage of justice to justify overturning the verdict on these grounds.

### C. There was sufficient evidence of emotional distress and reputational harm resulting from BofI's unlawful retaliation against Mr. Erhart.

#### 1. <u>BofI waived the argument that Mr. Erhart did not suffer reputational harm</u>.

BofI waived its argument that reputational damages were not caused by actionable conduct for Mr. Erhart's retaliation claims. *See Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (providing issues need to be "argued specifically and distinctly" and a mere "assertion of an issue" is not enough to preserve it); *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) (holding that a "passing reference" to an issue "[w]ithout meaningful briefing" waives it); *Greisen v. Hanken* (9th Cir. 2019) 925 F.3d 1097, 1115 n.6 (holding that issue "briefly alluded" to in Rule 50(b) motion was not "raised sufficiently for the trial court to rule on it" and "was waived for this reason.").

Here, BofI's Rule 50(b) renewed JMOL and New Trial Motion on the retaliation claims simply never addressed Mr. Erhart's reputational damages in any

substantive way.[1] *See* 2-ER-78-86. The district court correctly deemed the argument waived, as should this court. 1-ER-24.

### 2. <u>There was sufficient evidence of Mr. Erhart's emotional distress due to BofI's retaliation.</u>

The district court did not abuse its discretion when it denied BofI's motion for a new trial on the grounds of insufficient evidence of emotional distress; thus its order must stand. *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1039 (9th Cir. 2003) (citing this standard when considering an appeal based on insufficient evidence of emotional distress). BofI presents selective and incomplete evidence in an attempt to force its preferred interpretation that the harm Mr. Erhart suffered was not due to BofI's wrongful conduct. But the jury, after hearing *all* the emotional distress testimony, decided the damages amount based on the adverse actions that violated SOX, California Labor Code § 1102.5, and the tort of wrongful termination in violation of public policy.[2] Again, BofI's selective

---

[1] Although BofI did argue there were no reputational damages from *defamation* in its Rule 50(b) motion, that argument was also waived for failure to raise it pre-verdict pursuant to Rule 50(a). *See* Section E, *infra*.

[2] Again, BofI insists that the only conduct at issue was the June 9 termination. However, the law only requires an "unfavorable personnel action" under Sarbanes-Oxley and California Labor Code § 1102.5. As the jury was instructed, "[a]n unfavorable personnel action" is one that a reasonable employee would have found to be materially adverse, which means it might have dissuaded a reasonable worker from engaging in the protective activity and includes discharging, demoting, suspending, threatening, harassing or in any other manner discriminating against an employee in the terms and conditions of employment because the employee

presentation of the evidence is inconsistent with the requirement to view the facts in the light most favorable to Mr. Erhart and to make all reasonable inferences in Mr. Erhart's favor. *See Dees, supra,* 960 F.3d at 1151.[3]

The Ninth Circuit will uphold a jury's determination of the amount of damages, unless the amount is grossly excessive, clearly not supported by the evidence, or based only upon speculation or guesswork. *United States v. CB & I Constructors, Inc.*, 685 F.3d 827, 839 (9th Cir. 2012). The Ninth Circuit does not require objective evidence of emotional distress or that emotional distress damages be supported by substantial evidence. *Zhang v. Am. Gem Seafoods, supra*, 339 F.3d at 1040. Damages may be awarded based solely on testimony or appropriate inference from circumstances, including observations by others. *Id.*, citing to *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994) and *Carey v. Piphus,* 435 U.S.

---

engages in protected activity." 15-ER-2926. The Bank also prepared and attempted to deliver a termination letter on March 6, 2015, and Erhart was aware of this at the time. 4-ER-755; SER-54.

[3] BofI cites a few cases for the point that an employer-employee relationship is needed for Erhart's retaliation claims. AOB 29-30. These include an unpublished case where the plaintiff was not employed by the defendant (*Musin v. Honeywell International, Inc.* (D. Nev., Dec. 11, 2020, No. 219CV02058JADNJK) 2020 WL 7321064, at *1) and two cases (one from the District of Kansas, the other an unpublished ALJ decision from Georgia) in which the retaliation alleged took place years after the employment relationship had ended. *Jordan v. Sprint Nextel Corp.*, 3 F. Supp. 3d 917, 930-932 (D. Kan. 2014); *Harvey v. Home Depot, Inc.*, Case No. 2004-SOX-36, 2004 DOLSOX LEXIS 47, 2004 WL 5840284, at *3 (May 28, 2004) (ALJ). Here, in contrast, that relationship is totally straightforward—Erhart was employed by BofI, and BofI terminated him.

247, 264 n. 20 (1978) (noting that emotional distress damages are "essentially subjective").

BofI tries to muddy the waters by pointing to selective testimony from Mr. Erhart, including in the context of speaking about his life since losing his job. He talked about the "burden it took on [his] relationship" with his girlfriend and his difficulty finding work. AOB at 33; 6-ER-1159. It requires an illogical leap to conclude that this must have meant that the jury awarded Mr. Erhart emotional distress damages because of litigation or noncompensable conduct. The jury was not required to parse out the damages for different line items, but simply to address damages from retaliation based on all of the evidence, and all reasonable inferences therefrom. BofI apparently forgets that it must make all reasonable inferences in Mr. Erhart's favor (as the jury was entitled to do). *See Dees v. Cty. of San Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020), cert. denied, 141 S. Ct. 1501 (2021); *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000).

This argument also fails to credit the jury with following the court's instructions. The jury was explicitly instructed that they could not award damages for emotional distress suffered as a result of any litigation, including BofI's lawsuits against Mr. Erhart, his mother, and his girlfriend. 15-ER-2958-2959 (Jury Instruction Nos. 41, 42). The jury instructions were likewise clear that "[a]n unfavorable personnel action can only be taken while the employee is still

38

employed." 15-ER-2926. The verdict form was also clear that the damages must have resulted from an unfavorable personnel action. 15-ER-2970-2972. There is no evidence whatsoever that the jury failed to heed those instructions. *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) (per curiam) (holding that the jury is presumed to follow the court's instruction).

Furthermore, there was sufficient evidence for the jury to infer that BofI's retaliatory personnel actions against Mr. Erhart caused him emotional distress. Mr. Erhart was clear in arguing that "he is claiming emotional distress and harm, and damage to his reputation as a result of an unfavorable personnel action." 14-ER-2701. Mr. Erhart testified that, following his termination, he suffered from physical symptoms, including times where it was "hard … to breathe, sleepless nights … episodes where I became so sick to my stomach that I threw up. Just constant… anxiety." 6-ER-1149. It was a reasonable inference for the jury to make that BofI's unfavorable personnel actions were a significant source of his emotional distress.

Moreover, there was testimony tying Mr. Erhart's anxiety directly to the period in which BofI engaged in unfavorable personnel actions against Mr. Erhart. He testified that he did not suffer from anxiety before working at BofI. 6-ER-1149. Before the March 6, 2015, termination, Mr. Erhart had been threatened for putting things in writing and had been threatened that if he kept turning over rocks, he would find a snake and get bitten. 6-ER-1098; SER-10; SER-39. Mr. Erhart was

also aware that the Bank was attempting to deliver a termination letter and sending the police after him when he went out on medical leave, and that caused him fear. 5-ER-905-906; 5-ER-1025-1026; 6-ER-1124, 1156-1157; SER-7-8. He experienced stress starting the morning of March 6, 2015, when BofI first attempted to terminate him. 6-ER-1219-1220. Mr. Erhart testified that he "suffered from severe anxiety, breathing issues from all the stress, particularly related to the fear of the Bank's retaliation against -- against me and my loved ones." 12-ER-2385. There was sufficient evidence for the jury to tether Mr. Erhart's emotional distress symptoms to the retaliatory conduct of the Bank in the two terminations.

Additionally, Mr. Erhart's mother testified that she observed that her son was "not the same," that he used to be "the glass is half full kind of guy … [h]e just didn't dwell on negative thoughts…very happy-go-lucky…very confident" but that now he "doesn't carry the same confidence…[h]e is very timid." She testified further that these differences started when he lost his job at the Bank. 10-ER-2000.

BofI attempts to contrast this case with two prior cases, *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003), and *Johnson v. Hale*, 13 F.3d 1351 (9th Cir. 1994). In *Zhang*, the Ninth Circuit upheld an award of $223,155, solely on the basis that "[the plaintiff]'s testimony alone is enough to substantiate the jury's award of emotional distress damages." *Zhang* at 1040. Likewise, in *Johnson*, the Ninth Circuit held that it was error to award only de minimis damages in light

40

of the plaintiffs' testimony supporting their emotional damages. *Johnson* at 1352-1353. Similarly, here, Mr. Erhart's testimony and that of other witnesses to his emotional distress is adequate to support the award of damages for retaliation.

Additionally, other case law supports substantial emotional distress awards based entirely on witness' testimony in circumstances similar to this one. *See Wooten v. BNSF Ry. Co.*, 387 F. Supp. 3d 1078, 1102 (D. Mont. 2019), aff'd, 819 F. App'x 483 (9th Cir. 2020) (denying new trial or remittitur for $500,000 emotional distress damages award to employee who was terminated in retaliation for reporting workplace injury); and *Bahra v. Cnty. of San Bernardino*, 2022 WL 6653533, at *2 (C.D. Cal. Sept. 7, 2022) (denying new trial or remittitur for $2,000,000 emotional distress damages award; award was supported by whistleblower retaliation plaintiff's testimony that he suffered anxiety, humiliation, difficulty sleeping, stomach sickness and shortness of breath.)

### 3. **There was sufficient evidence of Mr. Erhart's reputational harm due to BofI's retaliation.**

Although BofI waived this argument (*see* section C.1, above), there was also sufficient evidence to support the jury's reasonable inference that Mr. Erhart suffered significant reputational harm as a result of BofI's retaliatory termination. Mr. Erhart testified that after BofI fired him, he has not had the career he expected, that he has worked hard to get promoted and to obtain new credentials, and that he is lucky to get part-time work through former FINRA colleagues amounting to just

10-15 hours a week. *See* 6-ER-1157-1160. His career has struggled "[t]o this day." 12-ER-2387. The jury was permitted to reasonably infer that BofI's terminating Mr. Erhart was a substantial factor in the long-lasting disruption of Mr. Erhart's career as a bank employee.

Accordingly, the district court did not err in denying BofI judgment as a matter of law. Nor did it abuse its discretion in denying BofI's motion on the grounds that there was insufficient evidence of emotional distress or reputational damages.

### D. The district court did not abuse its discretion in denying BofI's motion for a new trial on the grounds that the jury's award was grossly excessive.

BofI's attack on the district court's denial of its JMOL and New Trial Motion on the basis of grossly excessive damages is completely bereft of any evidence that the jury acted with passion or prejudice. The court did not abuse its discretion in declining to find the jury's award grossly excessive.

Mr. Erhart recovered damages under both state and federal law. In the Ninth Circuit, a court must uphold a jury's determination of the amount of damages, unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only upon speculation or guesswork. *United States v. CB & I Constructors, Inc.*, 685 F.3d 827, 839 (9th Cir. 2012). A trial court reviewing a damages award for gross excessiveness must consider the evidence of damages in

a light most favorable to the prevailing party. *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).

Further, a jury's award will not be set aside simply because its amount does not correspond to any particular calculation presented to the jury. *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1373 (9th Cir. 1987); *see also Wooten v. BNSF Ry. Co.*, 387 F. Supp.3d 1078, 1102 (D. Mont. 2019), aff'd, 819 F.App'x 483 (9th Cir. 2020) (viewing the evidence in the light most favorable to the plaintiff to deny new trial or remittitur for $500,000 emotional distress damages award to employee who was terminated in retaliation for reporting workplace injury); *Bahra v. Cnty. of San Bernardino*, 2022 WL 6653533, at *2 (C.D. Cal. Sept. 7, 2022) (denying new trial or remittitur for $2,000,000 emotional distress damages award; award was supported by whistleblower retaliation plaintiff's testimony that he suffered anxiety, humiliation, difficulty sleeping, stomach sickness, and shortness of breath).

Likewise, under California law, "there is no fixed or absolute standard by which to compute the monetary value of emotional distress," *Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1602 (2012), and a "jury is entrusted with vast discretion in determining the amount of damages to be awarded." *Id.* "It is the members of the jury who . . . are in the best position to assess the degree of the harm suffered and to fix a monetary amount as just compensation therefor." *Agarwal v. Johnson*,

25 Cal. 3d 932, 953 (1979), disapproved of on other grounds by *White v. Ultramar, Inc.*, 21 Cal. 4th 563 (1999)).

Here, the district court did not abuse its discretion in refusing to grant BofI's motion for a new trial. In *D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982), which BofI cites, the Ninth Circuit only determined there was no abuse of discretion in the lower court's remittitur of damages to the maximum amount sustainable by the proof. In the case at bar, the court was well within its discretion to affirm the jury's full damages award.

BofI cherry-picks unreported district court cases granting Rule 59 motions and/or ordering remittitur. AOB 36-37. These cases are inapposite and not binding. They are not appellate court decisions finding the higher standard of an abuse of discretion by the trial court in upholding the damages awarded by a jury. Nor do these cases stand for any principle *requiring* remittitur or a new trial; they are specific to the facts of those cases.[4] BofI itself does not put forward any

---

[4] In *Glenn-Davis v. City of Oakland*, No. C 02-02257SI, 2007 WL 687486, at *2 (N.D. Cal. Mar. 5, 2007), the court ordered remittitur because the testimony did not support the magnitude of the award where the emotional distress was premised on a single instance of failure to promote and the plaintiff experienced no retaliation. *Doherty v. State Farm Gen. Ins. Co.*, 2022 WL 2230123 (C.D. Cal. Jan. 11, 2022) concerned a homeowner's insurance coverage dispute where the district court found $3 million in emotional distress damages grossly excessive for a few instances of emotional distress and no evidence of significant harm. *Paul v. Asbury Auto. Grp., LLC*, No. CIV.06-1603-KI, 2009 WL 188592 at *8 (D. Or. Jan. 23, 2009) concerned months of a hostile work environment, not termination, and the

proposition for what the "right amount" should have been or show the court abused its discretion. This argument is unavailing.

BofI does not cite any evidence suggesting the jury was driven by passion or prejudice. Nor does it cite any evidence showing that the amount the jury awarded exceeded the "maximum amount sustainable by the evidence." *D&S Redi-Mix, supra*, 692 F.2d at 1249. On the contrary, the jury made a measured award in an amount substantially less than the amount Mr. Erhart requested at trial. 1-ER-28. As the trial court noted in denying Appellant's posttrial motion, Mr. Erhart testified that he suffered symptoms because of the actions the Bank took against him, that he "had severe anxiety for a very long time" and at times it was hard for him to breathe. *See* 1-ER-23; 6-ER-1148. He also testified to "sleepless nights" and times he became "so sick to [his] stomach that [he] threw up." 6-ER-1149. Here again, Appellant did exactly what the law prohibits: selectively noting other portions of Mr. Erhart's testimony to support its view. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000).

---

court determined the emotional distress was "fairly minor." Other unreported district court cases cited include *Johnson v. Albertsons LLC*, No. 2:18-01678-RAJ, 2020 WL 3604107, at *5 (W.D. Wash. July 2, 2020) (district court ordered remittitur where plaintiff testified she experienced humiliation and loss of self-esteem for a "relatively short" period of time) and *Alozie v. Arizona Board of Regents*, 562 F. Supp. 3d 203, 219 (D. Ariz. 2021) (where the plaintiff had been denied a promotion, not terminated, and only four statements regarding compensable harms were identified, including statement that it had been "hurtful.")

Mr. Erhart also suffered significant suffered harm to his reputation. He testified that since his employment at BofI ended, he has not had the career he expected, that he has worked hard to get promoted and to obtain new credentials, and that he is lucky to get part time work through former FINRA colleagues amounting to 10-15 hours a week. *See* 6-ER-1157-1160. His career has struggled "[t]o this day." 12-ER-2387. Thus, there was sufficient evidence from which the jury could ascertain that Mr. Erhart sustained $1 million in emotional distress and reputational harm.

Finally, BofI waived its arguments to challenge Mr. Erhart's reputational damages, because it failed to make substantive arguments in its JMOL and New Trial Motion. *See* section C.1, above. The trial court therefore declined to make arguments for Appellant it failed to make itself as to reputational damages. 1-ER-24. (citing *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) and *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir, 2019). It also doubly waived this issue here, since it makes no substantive arguments about Mr. Erhart's reputational harm in section D of its brief, choosing to focus only on emotional distress. *See* AOB 35-38.

In sum, substantial evidence supported the jury's award of damages for emotional and reputational harm, and the award was not grossly excessive. The verdict should stand.

**E. Sufficient evidence supports the jury's award for defamation.**

### 1. BofI waived this argument for its Rule 50(b) motion.

A party cannot raise arguments in its post-trial Rule 50(b) motion that it did not raise in its pre-verdict Rule 50(a) motion. *See E.E.O.C. v. Go Daddy Software, Inc.* 581 F.3d 951, 961 (9th Cir. 2009); *Wallace v. City of San Diego*, 479 F.3d 616, 631 (9th Cir. 2007) ("A renewed motion for judgment as a matter of law must be preceded by a motion made at trial that sets forth the specific grounds raised in the renewed motion.")

A court reviewing a Rule 50(b) motion based on grounds not previously asserted in a Rule 50(a) motion is "limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice." *Janes v. Wal–Mart Stores, Inc.*, 279 F.3d 883, 888 (9th Cir. 2002). "This exception ... permits only extraordinarily deferential review that is limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001).

Here, BofI waived this argument doubly. Firstly, it simply never moved pre-verdict to challenge Mr. Erhart's damages for the defamation claim as required. Indeed, BofI never cited anything in its Rule 50(b) motion to show where it had preserved this argument. Secondly, BofI never once raised a 50(a) motion on

grounds that Mr. Erhart did not suffer *reputational* damages for any of his claims.[5] Indeed, doing so would have been implausible given that the alleged defamatory statements made by Mr. Garrabrants during the investor call were explicitly that Mr. Erhart was incompetent at his job.[6] Accordingly, the district court correctly found that BofI waived this argument in its Rule 50(b) motion. 1-ER-24.

Mr. Erhart's defamation verdict must be upheld if supported by "*any* evidence." *Yeti, supra,* 259 F.3d at 1109. Mr. Erhart easily clears this threshold. Thus, the damages for his defamation claim must stand.

---

[5] Although BofI challenged Erhart's *emotional distress* damages, (*see* 10-ER-2051-2052) this was only in regard to Erhart's retaliation claims, *not* defamation.

[6] Mr. Garrabrants called Mr. Erhart "an inexperienced, underperforming, junior audit team member." 2-ER-282. He said Mr. Erhart "did not understand the Bank's management reporting systems" and was a "poor performer." 2-ER-283. Garrabrants further said Mr. Erhart's emails "were often incoherent and they did not elicit responses because of their incoherence." 2-ER-284. Mr. Garrabrants said "[Erhart] was doing a lot of things that he clearly was not competent to do . . . why was he so incompetent at what he was doing." 2-ER-288. He said Mr. Erhart displayed a "shockingly a low level of performance." *Id*. He also said Mr. Erhart "was doing a lot of things that he was so unqualified to do." 2-ER-290. He asserted that Mr. Erhart's emails displayed "a lack of basic understanding of the things that you're looking at." 2-ER-291. And he told the callers that Mr. Erhart "was routinely misunderstanding basic things." 2-ER-292. The jury also heard testimony from Mr. Erhart's direct supervisor and head of audit that the written quality of Mr. Erhart's audits was good. 8-ER-1582. It also heard testimony that Mr. Erhart had never been put on a performance improvement plan (and there was no reason to according to Ball), nor had he been written up for anything. 4-ER-804-806; 8-ER-1583.

### 2. **The jury's award is amply supported by the evidence.**

BofI's argument on whether sufficient evidence supports the jury's award of damages for defamation flips the standard of review for a 50(b) motion on its head. Mr. Erhart was not required to prove granular attribution of specific incidents of emotional distress and reputational harm to particular sentences within the statements which the jury found to be defamatory. Again, the evidence must be viewed in the light most favorable to Mr. Erhart, and all reasonable inferences must be drawn in his favor. *See Dees v. Cty. of San Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020), cert. denied, 141 S. Ct. 1501 (2021). The jury was entitled to listen to witnesses' testimony, weigh credibility and make reasonable inferences. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) ("the court…may not substitute its view of the evidence for that of the jury.").

#### i.   Reputational Harm

Ample evidence supports Mr. Erhart's damages for defamation. As for reputational harm, Mr. Erhart testified that he was unable to keep his job at Renovate America due to Garrabrants' comments on the October 14, 2015, investor call. 6-ER-1157-1158.[7] Additionally, Mr. Erhart testified that he encountered people who had heard these comments about him 5 to 10 times. 6-ER-

---

[7] BofI insists that this was the "only" evidence of reputational harm. AOB at 40. But that is plainly wrong, as the additional evidence provided in this section shows.

1153. Mr. Erhart went on to testify that since then he has not had the career he expected, that he has worked hard to get promoted and to obtain new credentials, and that he is lucky to get part-time work through former FINRA colleagues amounting to 10-15 hours a week. 6-ER-1159-1160. The jury could reasonably have inferred from this evidence that Garrabrants' statements about Mr. Erhart's competence were a substantial factor in preventing Mr. Erhart from getting his career in finance back on track.

BofI's counterarguments are unavailing. BofI argues that Mr. Erhart had higher paying jobs after BofI. See AOB at 40 fn. 18. While Mr. Erhart briefly held a higher paying position at Renovate America for about one year, he was later terminated after the executives heard Mr. Garrabrants' investor call and expressed concerns about it. ER-1157-1158. The jury was free to infer that Mr. Erhart was selected to be terminated by Renovate America due in part to concerns stemming from Garrabrants' statements. Moreover, brief periods of higher pay do not negate the overwhelming weight of evidence that Mr. Erhart's career was severely disrupted. *See, e.g.,* 12-ER-2387; 6-ER-1158-1159. Again, BofI tries to substitute its preferred view of the evidence over that of the jury, impermissibly. *See Reeves, supra,* 530 U.S. at 151.

50

ii.   Emotional Distress

In the Ninth Circuit, emotional distress damages may be awarded based on testimony alone or appropriate inference from circumstances. *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003); *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994). Objective evidence is *not* required. *Zhang*, 339 F.3d at 1040; *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir.1985).

Mr. Erhart suffered significantly, as documented repeatedly in this brief. *See* section C, above. For example, he testified that he suffered from physical symptoms: "hard … to breathe, sleepless nights … episodes where I became so sick to my stomach that I threw up. Just constant… anxiety." 6-ER-1149. He "suffered from severe anxiety, breathing issues from all the stress. 12-ER-2385. Mr. Erhart's mother testified that she observed that her son was "not the same," that he used to be "the glass is half full kind of guy … [h]e just didn't dwell on negative thoughts…very happy-go-lucky…very confident" but that now he "doesn't carry the same confidence…[h]e is very timid." 10-ER-2000.

From these facts alone, the jury was free to infer that Mr. Garrabrants' defamatory statements and their repercussions were substantial factors in causing this distress. But additionally, there was evidence tying Mr. Erhart's emotional distress *directly* to the defamation claims. Referring to Garrabrants' statements on the investor call, Mr. Erhart testified that he felt "worried about these accusations

and how people would interpret them and how that would impact my own reputation moving forward." 6-ER-1153. The jury could reasonably have inferred that these worried feelings contributed to Mr. Erhart's symptoms of sleeplessness, anxiety, *et cetera*.

Accordingly, viewing the facts in the light most favorable to Mr. Erhart, the damages due to defamation must stand.

## VIII. CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Date: June 14, 2024

THE GILLAM LAW FIRM
*A Professional Law Corporation*

*/s/ Carol Gillam*
Carol Gillam

*Attorneys for Appellee Charles Matthew Erhart*

52

**Certificate of Compliance for Briefs**
**9th Cir. Case Number(s) No. 23-3065**

I am the attorney or self-represented party. Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that the attached brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6). I also certify that, according to the word processing program with which the brief was prepared, the brief contains 12,277 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f), and that it therefore complies with the word limit of Ninth Circuit Rule 32-1(a).

**Signature** */s/ Carol Gillam*_____ **Date** June 14, 2024_____