# U.S. COURT OF APPEALS CASE NO. 23-3065

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

## CHARLES MATTHEW ERHART

*Plaintiff/Appellee,*

v.

## BofI FEDERAL BANK

*Defendant/Appellant.*

_____

*On Appeal From The United States District Court*
*For The Southern District of California, Case 15-cv-02287-BAS-NLS*
*The Honorable Cynthia Bashant, United States District Judge*

_____

## APPELLANT'S REPLY BRIEF

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Polly Towill, Cal. Bar No. 120420
John Landry, Cal. Bar No. 194374
Heather L. Plocky, Cal. Bar No. 279022
Madalyn A. Macarr, Cal. Bar No. 301539
David M. Berger, Cal. Bar No. 322595
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
TEL: 213.620.1780

*Attorneys for Defendant/Appellant BofI FEDERAL BANK*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................1

II. ARGUMENT...............................................................................2

    A.  The Evidence Permitted Only One Reasonable Conclusion on BofI's Same-Action Affirmative Defense – That BofI Met Its Burden ...............................................................................2

        1.  Evidence Purportedly Showing Retaliatory Intent Did Not Bear on BofI's Separate, Lack-of-Causation Showing ...........................................................................3

        2.  BofI's Lack-of-Causation Evidence Did Not Turn on Witness Credibility ...................................................5

        3.  No Evidence Negated BofI's Lack-of-Causation Showing........6

    B.  The District Court's Error in Admitting Evidence of Lawsuits Against Erhart's Mother and Former Girlfriend Tainted the Jury and Required a New Trial. ................................................11

        1.  BofI Properly Raised the Argument in Post-Trial Briefing, Appealed From the Judgment, and Raised this Argument in a Motion *in Limine*. .............................................11

        2.  Erhart Fails to Rebut BofI's Argument that the Admitted Evidence of Lawsuits Resulted in a Miscarriage of Justice........................................................................12

    C.  No Evidence Showed Injury From Actionable Retaliatory Conduct. ..............................................................................15

        1.  BofI Did Not Selectively Present Evidence of Erhart's Emotional Distress ...................................................15

        2.  Erhart Does Not Identify any Reputational Harm That Resulted From any Purported Retaliatory Act........................19

    D.  The Jury's $1 Million Award On Erhart's Retaliation Claims Was Grossly Excessive. .....................................................20

    E.  No Evidence Showed Any Injury Resulted From the Single Category of Statements the Jury Found Defamatory .........................25

III. CONCLUSION.............................................................................27

# TABLE OF AUTHORITIES

Page(s)

Cases

*Antuna v. County of L.A.*
2016 U.S. Dist. LEXIS 204417 (C.D. Cal. Aug. 31, 2016) ...............................22

*Bahra v. Cnty. of San Bernardino*
2022 U.S. Dist. LEXIS 162519 (C.D. Cal. Sept. 7, 2022) .................................21

*Baker v. Limber*
647 F.2d 912 (9th Cir. 1981) ...............................................................................12

*Bell v. Williams*
2024 U.S. App. LEXIS 17660 (9th Cir. July 18, 2024) .......................21, 23, 24

*Cosby v. Autozone, Inc.*
445 Fed. Appx. 914 (9th Cir. 2011)....................................................................22

*Coszalter v. City of Salem*
320 F.3d 968 (9th Cir. 2003) ...............................................................................13

*D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*
692 F.2d 1245 (9th Cir. 1982) .............................................................................20

*In re E.R. Fegert, Inc.*
887 F.2d 955 (9th Cir. 1989) ...............................................................................12

*Kingston v. IBM*
2022 U.S. App. LEXIS 21192 (9th Cir. Aug. 1, 2022)......................................22

*Lam v. City of Los Banos*
976 F.3d 986 (9th Cir. 2020) ...............................................................................12

*Murray v. UBS Sec., LLC*
601 U.S. 23 (2024)...................................................................................4, 5, 7, 8

*Paul v. Asbury Auto Grp., LLC*
2009 U.S. Dist. LEXIS 4924 (D. Or. Jan. 23, 2009).........................................24

*Roth v. Naturally Vitamin Supplements, Inc.*
2007 U.S. Dist. LEXIS 49379 (D. Ariz. July 5, 2007).......................................24

ii

*Wooten v. BNSF Ry. Co.*
   387 F. Supp. 3d 1078 (D. Mont. 2019), *aff'd*, 819 Fed. App'x 483 (9th
   Cir. 2020) ......................................................................................21

Statutes

18 U.S.C. § 1514A(b)(2)(C) ..........................................................................4

49 U.S.C. § 42121(b) ....................................................................................4

49 U.S.C. § 42121(b)(2)(B)(ii) .....................................................................7

49 U.S.C. § 42121(b)(2)(B)(iv) ..................................................................3, 7

Other Authorities

Federal Rule of Civil Procedure 50(a) ..................................................19, 25

## I.   <u>INTRODUCTION</u>

The numerous errors in the district court significantly prejudiced appellant BofI Federal Bank ("BofI"), and this Court should therefore reverse the judgment.

At trial, appellee Charles Matthew Erhart ("Erhart") centered his retaliation claims around his June 9, 2015 termination.  Yet, that termination occurred after he failed to report into work or call in for more than 16 consecutive business days. BofI, like any reasonable employer, would have terminated any employee who engaged in this same dereliction to this extreme degree, and no evidence suggested BofI would have not terminated Erhart on June 9, 2015 absent his protected activity (*see* Section II.A., *infra*.).  And while Erhart claimed to have experienced harm from retaliation, his testimony only linked his purported injury to distress caused by post-termination lawsuits BofI filed against his mother and ex-girlfriend, this litigation itself, and his fear of future retaliation—all of which is non-actionable conduct (*see* Section II.C., *infra*.).  BofI's lawsuits against his mother and ex-girlfriend also had no bearing on any issue.  Evidence of their existence should not have come in, but did.  And the jury's $1 million award on Erhart's retaliation claims proved that the district court's instructions to the jury did not cure the prejudice that resulted (*see* Section II.B., *infra*.).  An award of that size for garden-variety emotional distress cannot stand (*see* Section II.D., *infra*.).  Lastly, for Erhart's defamation claim, Erhart failed to link any reputational or emotional

harm to the only category of statements the jury found to be defamatory, while directly linking alleged harm to other non-defamatory statements (*see* Section II.E., *infra*.).  Hence, the district court erred when it denied BofI's Renewed Motion for Judgment as a Matter of Law and New Trial Motion (the "RJMOL and New Trial Motion").

Nothing in Erhart's Answering Brief changes this reality.  This Court should reverse the judgment below and the district court's Order denying BofI's RJMOL and New Trial Motion.

## II.  ARGUMENT

### A.  The Evidence Permitted Only One Reasonable Conclusion on BofI's Same-Action Affirmative Defense – That BofI Met Its Burden

BofI's same-action affirmative defense evidence consisted of (1) a timeline detailing Erhart's failure to return to work following the expiration of his extended medical leave and his subsequent continuous, unexplained absence, (2) BofI's express, written attendance policy, and (3) Erhart's admission that he was subject to termination under this policy as he "never came back to work" after his medical leave expired.  Opening Brief ("AOB") at 18-21.  This showing confirmed that BofI would have terminated Erhart on June 9, 2015 regardless of any protected

activity.[1] It was not a close question. No employer (not just BofI) would have retained an employee who, like Erhart, completely disappeared and failed to report to work or call in for 16 consecutive business days. Because no jury could have reasonably found otherwise, the district court erred in denying BofI's RJMOL and New Trial Motion on BofI's same-action defense.

To counter this, Erhart responds in three ways. First, he recites the record evidence the district court identified in the Order on BofI's RJMOL and New Trial Motion as sufficient to show BofI acted with retaliatory intent. Second, he claims BofI's same-action evidence depended on credibility determinations, so the jury was free to disregard the evidence. Third, Erhart points to BofI's failure to remind him before May 18, 2015 that his medical leave would expire on that date. These responses fail.

### 1. Evidence Purportedly Showing Retaliatory Intent Did Not Bear on BofI's Separate, Lack-of-Causation Showing

Erhart's Sarbanes-Oxley Act ("SOX") claim and state law retaliation claims were adjudicated under a two-step, burden-shifting framework. In his effort to defend the district court's Order, Erhart cites evidence the district court found

---

[1] *See* 49 U.S.C. § 42121(b)(2)(B)(iv) ("Relief may not be ordered . . . if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [protected activity]"). This same, same-action defense also precluded liability on Erhart's Section 1102.5 and wrongful termination claims.

sufficient to meet the initial burden imposed on the employee in the first step, specifically that Erhart's protected activity was a "contributing factor" in his June 9, 2015 termination.[2]  Answering Brief ("AAB") at 23-25; *see* Order at 12-13. This evidence pertained to BofI's knowledge of the protected activity and retaliatory intent (or animus), which is "one way" an employee can establish the "contributing factor" element.  *Murray v. UBS Sec., LLC*, 601 U.S. 23, 37 (2024); *see also* AAB at 28 (arguing "[t]here was ample evidence, as recited above, that led the jury to conclude that Mr. Erhart's termination and other adverse actions were *motivated* by his protected activity") (emphasis added).

This first-step proof, however, did not (and could not) answer the separate and distinct causation question that arose under the burden-shifting framework's second step.  Even when evidence satisfies the first step, the second protects from liability those employers who can show by clear and convincing evidence they would have taken the same unfavorable personnel action absent the protected activity.  *Id*. at 36-37 (describing the first and second steps).  Hence, even if Erhart established the "contributing factor" element in the first step, causation remained an "open question."  *Id.* at 41 (Alito, J., concurring).

---

[2] SOX directs district courts to apply the "legal burdens of proof set forth in section 42121(b) of title 49, United States Code."  *See* 18 U.S.C. §1514A(b)(2)(C). Section 42121(b) lays out a burden-shifting framework.

Moreover, as *Murray* explains, the finder of fact must answer this remaining question using a special causation hypothetical: "The right way to think about [the] same-action causation analysis is to 'change one thing at a time and see if the outcome changes.'" *Id*. at 38 (quoting *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020)). The question is "[w]hether the employer would have "'retain[ed] an otherwise identical employee' who had not engaged in the protected activity"). *Id*. (quoting *Bostock*, 590 U.S. at 660). And, if the answer is no, "the element of causation has not been proved." *Id*. at 41 (Alito, J., concurring).[3] The "contributing factor" and retaliatory intent evidence Erhart recites at length had no bearing on this distinct and separate causation inquiry.

### 2. BofI's Lack-of-Causation Evidence Did Not Turn on Witness Credibility

Erhart contends the evidence at trial required the jury to assess witness credibility, and so the jury could reject the same-action evidence on credibility grounds. AAB at 23, 27-28. He also cites to the district court's general comments that evidence at trial regarding retaliation and BofI's affirmative defense required credibility determinations. AAB at 23. But neither Erhart nor the district court identified the credibility determination on which BofI's same-action defense purportedly turned. There was not one. BofI's same-action proof took the form of

---

[3] This second step also serves to "sharpen the inquiry" on the intent element. *See Murray*, 601 U.S. at 37 (internal quotation marks omitted).

objective, incontrovertible timeline evidence and objective documentary evidence, specifically, the June 9, 2015 termination letter and BofI's written employee policy, which unequivocally stated: "[I]f an employee fails to report for work or call in for three consecutive calendar days, they will be considered to have abandoned their job and will be automatically terminated." 16-ER-3360; 6-ER-1189–94. The evidence establishing the same-action defense also included Erhart's own corroborating testimony in which he acknowledged that he was aware of BofI's return-to-work and attendance policy and was subject to termination under it. 6-ER-1193–94; 7-ER-1278–79. Based on this evidence, there was no dispute that Erhart's scheduled return-to-work date was May 18, 2015, yet did not report to work or call in for 16 consecutive business days before his June 9, 2015 termination. Witness credibility played no role in the jury's ability to assess this same-action evidence.

### 3. No Evidence Negated BofI's Lack-of-Causation Showing

To defend the verdict, Erhart also points to BofI's failure to contact him before May 18, 2015 to remind him that his medical leave would expire on that date. AAB at 10, 16, 25. However, BofI's written Family and Medical Leave Act ("FMLA") leave and return-to-work policy did not undertake any reminder procedures, and neither Erhart nor the district court pointed to any evidence to the contrary. Moreover, the extended medical leave approval notice sent to Erhart on

April 16, 2015, specifically informed him of his new May 18, 2015 return date.
16-ER-3318. At trial, the person at BofI responsible for coordinating employee
FMLA leave testified that the "process" she used called for such a reminder. The
district court noted this testimony in its Order. 1-ER-16 But no evidence
suggested BofI's failure to provide Erhart with an additional reminder of the May
18, 2015 return date had anything to do with to his failure to report to work or call
in at any time between May 18 and June 9, 2015. Nor could the lack of a reminder
notice possibly explain Erhart's failure to report to work, not just for a day or two,
but for *16 consecutive business days* until BofI formally terminated his
employment on June 9, 2015 for job abandonment. Erhart never offered BofI an
explanation for his complete failure to return to work or call in, not even at trial.[4]

But even assuming BofI's failure to provide Erhart a return-date reminder
showed BofI departed from some actual "policy," the failure was at most probative
of intent, not causation.[5] As *Murray* instructs, the proper way to answer the

---

[4] Erhart made no constructive discharge claim and never attributed his failure to
report to work to any concerns he had about returning to BofI. Although Erhart
testified that, at the time he received the June 9, 2015 termination letter, he wanted
to continue working at BofI, 6-ER-1167, he never contacted anyone at BofI to ask
for his job back or to explain the reason for his prolonged absence.

[5] Erhart never claimed that the failure to provide the return-date reminder itself
constituted an adverse personnel action under SOX. *See* 49 U.S.C. §
42121(b)(2)(B)(ii) and (iv) (requiring that the protected activity be a "contributing
factor in the unfavorable personnel action *alleged in the complaint*") (emphasis
added).

causation question is to ask whether BofI would have retained another employee who had not engaged in protected activity but who was "otherwise identical," which means an employee who, like Erhart, did not receive a return-date reminder, failed to report or call in for 16 consecutive business days, and never explained his disappearance, much less attributed it to any lack of a reminder notice. *See Murray*, 601 U.S. at 38 ("change one thing at a time and see if the outcome changes") (internal quotation marks omitted). And this question could only yield one answer: no. And any departure in providing a FMLA-leave return-date reminder to Erhart did not speak to whether BofI consistently enforced its separate and distinct three-day failure-to-report or call-in policy.

In an additional, separate argument, Erhart claims BofI's "on-the-spot" effort to terminate his employment on March 6, 2015 (on BofI's stated ground that he failed to attend mandatory meetings that morning)[6] represented a failure by BofI to adhere to its own employee policy, "which was to terminate an employee [only] if they were out for three days without explanation (no call, no show)." *See* AAB at 8, 10, 29. According to Erhart, this showed "the bank disregarded its own policies—and practices—when it suited the bank to do so." AAB at 29. Presumably, Erhart wants to suggest the evidence showed BofI did not consistently

---

[6] No termination resulted.

enforce its three-day failure-to-report or call-in policy, and so BofI would not have necessarily enforced it against Erhart on June 9, 2015 but for his protected activity.

But this argument has no evidentiary support. Nothing suggested that BofI's policy did not allow a so-called "on-the-spot termination" when an employee did not show up or call in (particularly when he would be absent for two critical meetings). And BofI's policy stated that "an employee may be terminated at any time for failing to report to work without contacting his/her supervisor." 16-ER-3360; 6-ER-1189-1194.[7] The only purported evidentiary support Erhart offers is testimony (from BofI's medical leave coordinator) at 5-ER-852-854. AAB at 8, 10.[8] But the only possibly relevant portion of that testimony went no further than this:

> Q. All right. But the Bank policy is not to terminate an employee within a few hours of them not showing up to work on a given day; correct?
>
> **A. I do not know that.**
>
>                 * * *

---

[7] Erhart was an "at-will" employee. 6-ER-1173:19–1174:5.

[8] The district court's Order cites these same transcript pages as supporting its statement that BofI's March 6, 2015 "on-the-spot termination" attempt "clashed with BofI's attendance policy, which was to terminate employees if they had three days of unexplained absences—not just a single morning." 1-ER-10. But the cited record does not support this statement and, in fact, negates it.

Q. Okay. All right. And in your experience, did you ever terminate an employee the morning that they failed to show up for work?

**Q. That's – that was not my function. I would not know that.**

4-ER-853. This testimony did not contradict BofI's written employee policy that expressly authorized "terminat[ion] at any time for failing to report to work without contacting his/her supervisor." 16-ER-3360; 6-ER-1189-1194. Contrary to Erhart's argument, enforcement of that policy did not conflict with any other policy. Hence, there was no evidence before the jury showing BofI failed to consistently follow its attendance policy to suggest it would not have taken the same unfavorable personnel action on June 9, 2015 in the absence of Erhart's protected activity.[9]

---

[9] But even if BofI's failed attempt to terminate Erhart on March 6, 2015 did not conform to its attendance policy (it did), if anything, it suggested an over-enforcement by BofI of its attendance policy, not that BofI might otherwise have not (or more leniently) applied it against Erhart on June 9, 2015 but for his protected activity. This is particularly the case as the three-day failure-to-report or call-in policy was a strongly worded, "automatic" policy that Erhart egregiously violated.

**B.** **The District Court's Error in Admitting Evidence of Lawsuits Against Erhart's Mother and Former Girlfriend Tainted the Jury and Required a New Trial.**

    **1.** **BofI Properly Raised the Argument in Post-Trial Briefing, Appealed From the Judgment, and Raised this Argument in a Motion *in Limine*.**

Erhart claims BofI waived its argument that the district court improperly admitted evidence of lawsuits brought by BofI against Erhart's mother and ex-girlfriend, which resulted in BofI securing confidential customer data they possessed—lawsuits that BofI argued were irrelevant to any claim or defense, and prejudicial. AAB at 29. His waiver claim is two-fold: (1) BofI did not adequately brief this particular evidentiary issue in its RJMOL and New Trial Motion; and (2) because BofI's opening brief only states that it "appeals the district court's denial of its Renewed Motion for Judgment as a Matter of Law Or In The Alternative, Motion for New Trial[,]" it waived the argument as a whole. *See id.* Erhart's waiver arguments lack merit.

Contrary to Erhart's claim, BofI did argue in its RJMOL and New Trial Motion that the irrelevant evidence of BofI's lawsuits highly prejudiced BofI and resulted in a miscarriage of justice to BofI. 2-ER-80–81. "The rule in this circuit is that appellate courts will not consider arguments that are not 'properly raise[d]' in the trial courts. There is no bright-line rule to determine whether a matter has been properly raised. A workable standard, however, is that the argument must be

raised *sufficiently for the trial court to rule on it*." *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) (citations omitted) (emphasis added). BofI sufficiently raised these arguments because the district court devoted two pages to rejecting it in denying the RJMOL and New Trial Motion. 1-ER-29–31.

In any event, it is the notice of appeal that establishes the issues to be addressed on appeal. *Baker v. Limber*, 647 F.2d 912, 919 (9th Cir. 1981). BofI's Notice of Appeal states that this appeal is from the district court's amended judgment and all orders merged and incorporated therein. 16-ER-3442–43. As stated in the Opening Brief, *before trial*, BofI moved *in limine* to exclude evidence of these lawsuits because they were not relevant and the danger of unfair prejudice to BofI substantially outweighed their probative value. 15-ER-2986–3002. By briefing the issue in its motion *in limine* and raising various objections on the same grounds during trial, BofI "properly raised" the issue before the trial court. *Lam v. City of Los Banos*, 976 F.3d 986, 1005 (9th Cir. 2020) (holding that issue is preserved for appeal by raising the objection in a motion *in limine* where the trial court's ruling was definitive). Thus, no waiver occurred.

### 2. Erhart Fails to Rebut BofI's Argument that the Admitted Evidence of Lawsuits Resulted in a Miscarriage of Justice

Erhart argues that the existence of the lawsuits against his mother in January 2016 and ex-girlfriend in May 2016 was (1) relevant to his retaliation claims against BofI, (2) relevant to BofI's counterclaims against him, and (3) not

prejudicial to BofI so as to inflame the jury against BofI. AAB at 23-29. These arguments lack merit.

BofI's filing of the lawsuits did not, as Erhart claims, "ma[ke] it more likely true than not that the Bank's stated reasons for Mr. Erhart's termination were mere pretext and that his termination truly was retaliatory." AAB at 33. The time that passed between Erhart's June 9, 2015 termination and the lawsuit filings (January and May 2016), and the events that transpired in this time frame make this clear.[10] During that period, the New York Times had published confidential bank information about BofI which Erhart's lawyer had supplied, BofI's stock price had plummeted on news that Erhart filed the complaint in this case, and BofI had become aware that Erhart had removed confidential customer information from BofI, transmitted that data to third parties, and stored that sensitive data in unsecure locations. *See* 9-ER-1783:6–1785:6. Given this passage of time and these intervening events, BofI's 2016 lawsuits against Erhart's mother and ex-girlfriend were divorced from and could not have been probative of any retaliatory intent (or animus) towards Erhart that purportedly existed as of June 9, 2015 for his having earlier engaged in protected activity while employed at BofI.[11]

---

[10] By the time of the 2016 filings, Erhart's protected whistleblowing activity and employment with BofI had ceased.

[11] Like the district court, Erhart relies on *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003), but that case concerns only the passage of time between the

In the alternative, Erhart argues the lawsuits were relevant to his defense to BofI's counterclaims. AAB at 33. He insists the district court correctly allowed him to "tell his story of what happened," including using his girlfriend's laptop as part of his whistleblowing, and emailing his mother a document for safekeeping. *See id.* This argument misses the point. BofI is not arguing that it was error to admit evidence that Erhart transmitted BofI's confidential information to his mother and former girlfriend for what he believed were evidence-preservation or other whistleblowing purposes. Even assuming the jury needed to know (to assess liability or estimate damages) that the data was eventually secured, *how* the data came to be returned (voluntarily or through third-party litigation brought by BofI) had no bearing on any issue.

Even if the evidence of the lawsuits was relevant, its admission risked inflaming the jury. In denying BofI's motion for a new trial, the district court reasoned that its instructions to the jury were sufficient to prevent the jury from awarding Erhart damages for the emotional distress that he claimed the lawsuits caused him. *See* 1-ER-30–31. But these instructions certainly were not sufficient:

---

alleged protected activity and the alleged actionable adverse employment action. 1-ER-30. It does not address the scenario here, where the lawsuits were themselves not adverse employment actions, were filed seven and eleven months *after* the adverse employment action, and after a number of intervening events between Erhart and BofI had transpired. The lawsuits could not shed light on BofI's retaliatory intent as of June 2015.

14

The only evidence at trial supporting the jury's $1 million damages award on Erhart's retaliation claims was the alleged emotional distress he experienced from the lawsuits against his mother and former girlfriend (or this lawsuit, or the fear of any future lawsuits brought by BofI). *See* Section II.C., C., *infra*. This refutes Erhart's claim that "[t]here is no evidence whatsoever that the jury failed to heed" the district court's instructions. AAB at 34. Because no evidence shows Erhart suffered any emotional distress or reputational harm as a result of his June 9, 2015 termination (*see* Section II.C. *infra*), the only explanation for the jury's damages award is the district court's improper admission of evidence of BofI's lawsuits against Erhart's mother and former girlfriend *and* its instructions that failed to cure the prejudice caused by that evidence.

### C.  No Evidence Showed Injury From Actionable Retaliatory Conduct.

As demonstrated in the Opening Brief, no evidence at trial showed Erhart suffered emotional distress or reputational harm from any personnel action taken by BofI against him. Erhart fails to show otherwise.

#### 1.  BofI Did Not Selectively Present Evidence of Erhart's Emotional Distress

Erhart claims BofI "present[ed] selective and incomplete evidence" to show the absence of an evidentiary link between Erhart's emotional distress and actionable retaliation. AAB at 36. But Erhart fails to point to any additional

emotional distress evidence that BofI did not address and that could support his retaliation claims. Not a single record cite in the Answering Brief identifies evidence showing a connection between any alleged emotional distress and any retaliatory act.

First, Erhart cites his testimony concerning the "burden it took on [his] relationship" with his ex-girlfriend. AAB at 38. Assuming this testimony conveyed Erhart's emotional distress injury, Erhart did not connect the injury to an act of retaliation. The testimony came in response to a series of questions regarding his life's trajectory post-BofI, disassociated from and without reference to any specific BofI conduct, starting with "seven-plus years later than when you left the Bank . . . have you had any kind of a career that you'd hoped for after leaving the Bank?[,]" and ending with: "Have you lost friendships?" 6-ER-1158:22–24; 6-ER-1159:21. Erhart responded as follows: "A few along the way. I mean, some of those are just the nature of just being human. But, I mean, the hardest thing for me was *the burden it took on my relationship with [my ex-girlfriend], who the Bank sued. **That was probably the worst**.*" 6-ER-1159:22–25 (emphasis added). This testimony did not link the "burden" Erhart experienced in his relationship with his ex-girlfriend to his June 9 termination (or any other purported retaliatory adverse employment action). At most, his testimony linked it to BofI's lawsuit against his ex-girlfriend months after his termination, conduct

16

which was concededly not actionable.  AAB at 34 (recognizing that the lawsuits against third parties constitute "[e]vidence of non-compensable post-retaliation conduct.")

Second, Erhart cites to testimony in which he claimed he suffered symptoms, including times where it was "hard . . . to breathe, sleepless nights . . . episodes where I became so sick to my stomach that I threw up.  Just constant . . . anxiety."  AAB at 39 (citing 6-ER-1149:4–7).  This testimony came in response to this over-generalized question: "What other kinds of symptoms did you experience that you attribute to the conduct of the Bank against you?  6-ER-1148:23–24. Erhart's response did *not* tie the symptoms to actionable conduct.  In the only effort to tie them, he stated: "a lot of [the symptoms] spawned from, like, *fear of retaliation*."  6-ER-1149:9–10 (emphasis added); *see also* 12-ER-2384–85 (emphasis added) (identifying "fear of retaliation that the Bank was going to accuse me of something . . . or attack me or people around me" as the "***root cause***" of his anxiety); [12-ER- 2385] (complaining about "severe anxiety, breathing issues from all the stress, ***particularly related to the fear of the Bank's retaliation against*** -- against me and my loved ones." (emphasis added).  Again, no testimony linked the symptoms to actionable conduct, just fear of future "retaliation" by BofI during a time period well after June 9, 2015.

SMRH:4863-4408-4176.11

17

Finally, Erhart cites to testimony in which he claims that he experienced stress on the morning of March 6, 2015. AAB at 40. In response to BofI's questioning about why Erhart did not show up for work on the morning of March 6, 2015, Erhart testified that he had anxiety. 6-ER-1219:14–15. But this was not emotional distress within the scope of his retaliation claims for which he could recover. BofI did not terminate him until June 9, 2015, and even if the attempted March 6, 2015 termination constituted an adverse personnel action (it did not), the decision to terminate Erhart that day was not made until the afternoon, and Mr. Erhart did not learn about this attempt until after March 6, 2015.[12] *See* 6-ER-1222:11–24.

To the extent Erhart cites to any additional emotional distress evidence, it is obvious that he is referencing the emotional distress that arose from his litigation with BofI, and his fear of prospective post-termination retaliation that never materialized, conduct that was also non-actionable and provided no basis for a damages award. 6-ER-1241 (the Court recognized "[i]t's clear that he can't recover because of this litigation . . . you cannot recover for the stress of litigation."); 15-ER-2958 ("Neither side may recover any damages for any injury suffered as a result of the filing of this lawsuit, the counter claims, or any other

---

[12] Erhart claims he was aware of BofI's March 6, 2015 undelivered termination letter "at the time." AAB at 9, 12, 36-37, n. 2. None of his cited evidence supports that assertion.

SMRH:4863-4408-4176.11                                       18

lawsuit."); 1-ER-49 (emotional distress resulting from post-termination conduct is not compensable).

### 2. Erhart Does Not Identify any Reputational Harm That Resulted From any Purported Retaliatory Act

In its Opening Brief, BofI also argued (and showed) that the trial record contained no evidence of retaliation-related reputational harm. In response, Erhart contends the district court "deemed the argument waived" because BofI failed to make it at the Rule 50(a) stage. AAB at 36. The district court made no such ruling. In responding to Erhart's Rule 50(a) waiver argument, the district court referenced BofI's counsel's oral statement in moving for judgement as a matter of law at trial and observed that, notwithstanding that "reputational harm" was not mentioned, counsel "surely intend[ed] to dispose of all remaining potential damages for Erhart's retaliation claims." 1-ER-22. Although it called the question "close," the district court did not, as Erhart claims, agree with him that BofI had failed to adequately preserve the argument. Indeed, the district court, in ruling on BofI's RJMOL and New Trial Motion, specifically addressed it. *See* 1-ER-24.

On the merits of BofI's argument, Erhart identifies no record evidence showing reputational harm from retaliation. *See* AAB at 41–42. The testimony he cites concerned purported harm relating to his defamation claim (not his retaliation claims) or purported harm that was not tied to any retaliatory act. *See* 6-ER-1157:12–15; 1158:16–18 ("Q. When -- has anybody in the world outside of the

Bank ever told you that they've heard allegations about you that led them to believe that they cannot trust you or they cannot give you a job?" . . . A. I knew the executive level at my next company was really concerned about the allegations levied against me [with respect to the lawsuit that BofI filed against me]"); 6-ER-1158:22–1159:6 ("Q. So here you are, seven-plus years later than when you left the Bank, and have you had any kind of a career that you'd hoped for after leaving the Bank? A. Not as I had envisioned, no. Q. Do you have any kind of work, part-time work, gig work, anything like that? A. So currently I have some part-time work that I was -- been lucky enough to get through former colleagues of mine that I worked with at FINRA. So I work about, I don't know, 10 hours, 15 hours a week.") Hence, there is no reputational harm evidence by which to sustain any damages award for reputational harm.

### D. The Jury's $1 Million Award On Erhart's Retaliation Claims Was Grossly Excessive.

The Answering Brief fails to rebut BofI's clear showing that that the jury's $1 million award for garden-variety emotional distress and reputational harm surpassed the "maximum amount sustainable by the evidence." *D&S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

In its Opening Brief, BofI cites numerous decisions from this Circuit where the district court significantly reduced damages for similar "garden variety" emotional distress Erhart purportedly experienced to amounts far less than $1

million.  AOB at 36-38.  Erhart contends that these cases are "inapposite and not

binding" because they are unreported district court cases and turn on the specific

facts of each case.  AAB at 44.  However, one of the main factors courts consider

in determining whether a damages award is grossly excessive is "awards in

comparable cases." *Bell v. Williams*, 2024 U.S. App. LEXIS 17660, at *49 (9th

Cir. July 18, 2024).  Decisions in this Circuit granting remittitur and reducing

emotional distress damages to amounts between fifteen and twenty percent of the

damages awarded in this case, on comparable facts, provide insight to the

"reasonable bounds" for a damages award for emotional distress in this case.  *Id*. at

*50; *see also* AOB at 37.[13]

      Erhart next claims that none of the cases cited by BofI *require* remittitur or a

new trial.  AAB at 44.  However, courts in this Circuit are clear that where, as here,

a damages award "'is so great as to shock the conscience of the court and create

---

[13] The handful of decisions cited by Erhart where district courts have upheld damages awards for emotional distress do not alter the reasonable bounds for a damages award in this case.  *See Wooten v. BNSF Ry. Co.*, 387 F. Supp. 3d 1078, 1102 (D. Mont. 2019), *aff'd*, 819 Fed. App'x 483 (9th Cir. 2020) (upholding award of only $500,000—half the amount awarded in this case—where plaintiff "came from a 'railroad family' in a small 'railroad town' and was wrongfully terminated and decried as a liar by the railroad"); *Bahra v. Cnty. of San Bernardino*, 2022 U.S. Dist. LEXIS 162519, at *9 (C.D. Cal. Sept. 7, 2022) (upholding award of $2 million for emotional distress where plaintiff testified he suffered from anxiety, sickness, pervasive worry, and physical symptoms as a result of his emotional pain).  The latter case is anomalous in light of the overwhelming, countervailing precedent limiting emotional distress damages to well below $1 million in cases such as this one.  *See* AOB at 36-38.

the impression that the jury has been motivated by passion, corruption or prejudice or has misconceived or misconstrued the facts or the law,' the Court is not only empowered but indeed **obligated** 'to step in and correct the injustice.'" *Antuna v. County of L.A.*, 2016 U.S. Dist. LEXIS 204417, at *16-17 (C.D. Cal. Aug. 31, 2016) (citation omitted) (bold and italics in original).

Erhart further asserts that the cases cited by BofI are distinguishable because none involve an appellate court reviewing a district court's decision to uphold a damages award and deny remittitur for abuse of discretion. AAB at 44. However, the Ninth Circuit has repeatedly done just this in similar contexts. *See Kingston v. IBM*, 2022 U.S. App. LEXIS 21192, at *5-6 (9th Cir. Aug. 1, 2022) (holding that district court abused its discretion in upholding damages award where plaintiff's emotional distress because of his termination "d[id] not appear to have been significantly greater than what anyone might suffer from being fired" and the non-economic damages awarded exceeded amounts other courts have upheld in similar cases); *Cosby v. Autozone, Inc.*, 445 Fed. Appx. 914, 916-17 (9th Cir. 2011) (holding that district court abused its discretion in upholding damages award where evidence did not support award of $1,326,000 in non-economic damages for past mental suffering because plaintiff "eventually found satisfactory employment" after his termination); *see also Bell*, 2024 U.S. App. LEXIS 17660, at *47-48 ("an

appellate court may need to order remittitur to correct excessive awards for emotional distress.").

Indeed, just recently, in *Bell*, the Ninth Circuit vacated a jury's damages award of $504,000, the majority of which was attributable to plaintiff's emotional distress and pain and suffering, and remanded for a remittitur or a new trial based on the award being "grossly excessive." *Id*. at *4-5, 46-47. While this Court acknowledged that testimony alone can support compensatory damages for emotional distress, it emphasized that "exceptional damages awards"—like an award of $504,000—"require substantial evidence, whether it comes in the form of detailed testimony or other supporting documentation," which it found to be missing. *Id*. at *53. Comparing the damages award against comparable cases, the Court further concluded that "[a] compensatory damages award above [$500,000] demands much more evidence of pain and/or great emotional anguish to be sustainable." *Id*. at *54. The Court stressed that "[t]here 'must be an upper limit' to every damages award," and "[l]ocating that upper limit is a question of law, not fact, and is subject to appellate review." *Id*. at *48 (citation omitted).

Here, the jury's $1 million award exceeded that "upper limit." Erhart fails to point to any testimony indicating he suffered anything other than the sort of "garden variety" emotional distress courts routinely hold cannot support a damages award as high as this one. *Compare* AAB at 45 (describing feelings of anxiety,

difficulty breathing, trouble sleeping, and nausea) *with Paul v. Asbury Auto Grp., LLC*, 2009 U.S. Dist. LEXIS 4924, at *20-25 (D. Or. Jan. 23, 2009) (granting remittitur where plaintiffs testified they suffered from depression, trouble sleeping, headaches, and loss of appetite resulting in significant weight loss, but where "[n]one of the plaintiffs described a need for short-term or ongoing psychological counseling of any kind"). Indeed, Erhart stipulated that he would not offer any testimony from any medical professionals because he was claiming only garden variety emotional distress. 15-ER-3054-57. Erhart's testimony of emotional distress falls short of the "substantial evidence" required to support a damages award of this magnitude.[14] *See Bell*, 2024 U.S. App. LEXIS 17660, at *53-54.

Nor is Erhart's vague testimony of reputational harm, including that "he has not had the career he expected," sufficient to support the $1 million damages award.[15] *See* AAB at 46; *see also Roth v. Naturally Vitamin Supplements, Inc.*, 2007 U.S. Dist. LEXIS 49379, at *12-14 (D. Ariz. July 5, 2007) (reducing $300,000 damages award for reputational harm to $10,000 where "[t]he only

---

[14] Erhart also cannot link any of his purported emotional distress to any actionable retaliatory acts. *See* Section II.C.1., *supra*.

[15] Erhart also suggests in his Answering Brief that BofI somehow waived its arguments to challenge Erhart's reputational damages by failing to make substantive arguments regarding reputational harm in its RJMOL and New Trial Motion and Opening Brief. Answering Brief at 46. But BofI addressed Erhart's reputational harm in these briefs. *See* 1-ER-85; AOB at 35.

evidence presented to establish reputation damage is [plaintiff's] own testimony" regarding certain companies that no longer contact him).

### E. No Evidence Showed Any Injury Resulted From the Single Category of Statements the Jury Found Defamatory

The jury found that BofI defamed Erhart through statements that fell into the category "Mr. Erhart was incompetent at his job." 15-ER-2972–73. But Erhart's trial testimony did not identify an injury resulting from any statement in that category, only injuries from a completely separate statement category—"Mr. Erhart conspired with short sellers to drive down the price of BofI stock and harm BofI"—a category the jury in the end determined was not defamatory. 15-ER-2972–73. Erhart's Answering Brief never confronts this central problem.

Erhart claims BofI failed to raise this argument in its Rule 50(a) motion and so waived it. AAB at 47. But as explained in the Opening Brief, it would have been improper for BofI to make this challenge pre-verdict because the jury was instructed to award nominal damages if (as was the case) Erhart failed to prove any actual damages resulting from the defamation. *See* AOB at 39. Erhart simply ignores this argument, and so concedes it.[16]

---

[16] Even if this Court deems that BofI waived this argument, that did not affect BofI's request for a new trial on the grounds that the verdict was contrary to the clear weight of the evidence or to prevent a miscarriage of justice.

As for the merits, Erhart ignores BofI's argument that he failed to attribute any reputational harm or emotional distress to the defamatory statements regarding his competence as an internal auditor. Instead, he insists his testimony showed he suffered reputational harm because his subsequent employer (Renovate America) "heard or read the allegations that the Bank had made against [Erhart], particularly around [BofI's CEO] Mr. Garrabrants's comments about trying to profit from the price of the stock going down." AAB at 49 (citing to 6-ER-1157-1158). But the only category of statements identified in this testimony is the category concerning Erhart's conspiring with short sellers to profit from the decline in BofI's stock price, which the jury did not find defamatory. 15-ER-2972–73.

Erhart also cites testimony that he has not had the career he had hoped for, and claims that the jury could infer from this injury that it necessarily arose from a statement in the "incompetent at his job" category. AAB at 50. But his testimony regarding this injury was elicited by this question: "Q. So here you are, seven-plus years later than when you left the Bank, and have you had any kind of a career that you'd hoped for after leaving the Bank?" 6-ER-1158:22-24. That question and Erhart's answer ("[n]ot as I had envisioned" and that he has some part-time work) did not causally link the injury to a statement from the competence category or exclude the possibility that the injury derived from statements within the other three categories the jury did not find defamatory (i.e., Erhart "was untruthful,"

"conspired with short sellers," and "would be behind bars for his conduct"), each of which could also have affected his career path.  15-ER-2972–73.

As to any emotional distress, the record contains no evidence linking it to a defamatory statement regarding Erhart's competence.[17]  He attempts to claim otherwise by stating "there was evidence tying Mr. Erhart's emotional distress *directly* to the defamation claims" and citing testimony that he felt worried about "these accusations" Mr. Garrabrants had made during the investor call.  AAB at 51-52 (emphasis in original).  But the question and answer cited above shows that in discussing "these accusations," Erhart was only describing Mr. Garrabrants' statement about Erhart trying to personally profit from BofI's stock decline.  6-ER-1152-53.  Again, the jury did not find that statements regarding conspiring with short sellers to be defamatory.  Thus, the jury could not have reasonably inferred that Erhart's anxiety resulted from statements regarding his competence.

## III.  **CONCLUSION**

For the foregoing reasons, BofI respectfully requests that this Court reverse the judgment and the district court's Order denying BofI's RJMOL and Motion for New Trial.

---

[17] The district court also identified no evidence of emotional distress resulting from defamatory statements concerning Erhart's competence in its Order denying BofI's RJMOL and New Trial Motion.

Respectfully submitted.

s/ *Polly Towill*

Dated: August 5, 2024

Polly Towill
Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Fl.
Los Angeles, CA 90071
(213) 620-1780

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that the attached brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6).  I also certify that, according to the word processing program with which the brief was prepared, the brief contains 6,579 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f), and that it therefore complies with the word limit of Ninth Circuit Rule 32-1(a), (b).

s/ *Polly Towill*
Polly Towill

Dated: August 5, 2024

SMRH:4863-4408-4176.11